

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-21-2008

# CBS Corporation v. FCC

Precedential or Non-Precedential: Precedential

Docket No. 06-3575

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"CBS Corporation v. FCC" (2008). *2008 Decisions*. Paper 756.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/756

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 06-3575

———————

CBS CORPORATION;
CBS BROADCASTING INC.;
CBS TELEVISION STATIONS, INC.;
CBS STATIONS GROUP OF TEXAS L.P.;
and KUTV HOLDINGS, INC.,
                    Petitioners

v.

FEDERAL COMMUNICATION COMMISSION;
UNITED STATES OF AMERICA,
                    Respondents

———————

On Petition for Review of Orders of the
Federal Communications Commission
FCC Nos. 06-19 and 06-68

———————

Argued September 11, 2007

Before: SCIRICA, *Chief Judge*,
RENDELL and FUENTES, *Circuit Judges*.

(Filed July 21, 2008)

ROBERT CORN-REVERE, ESQUIRE (ARGUED)
Davis Wright Tremaine LLP
1919 Pennsylvania, N.W., Suite 200
Washington, D.C. 20005

JEROME J. SHESTACK, ESQUIRE
Wolf Block Schorr and Solis-Cohen LLP
1650 Arch Street, 22nd Floor
Philadelphia, Pennsylvania 19103
        Attorneys for Petitioners

ERIC D. MILLER, ESQUIRE (ARGUED)
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W., Room 5634
Washington, D.C. 20530

JOSEPH R. PALMORE, ESQUIRE
Federal Communications Commission
Office of General Counsel
445 12th Street, S.W.
Washington, D.C. 20554

THOMAS M. BONDY, ESQUIRE
United States Department of Justice
Appellate Section
950 Pennsylvania Avenue, N.W., Room 7535
Washington, D.C. 20530
      Attorneys for Respondents

JOHN B. MORRIS, JR., ESQUIRE
Center for Democracy & Technology
1634 I Street, N.W., Suite 1100
Washington, D.C. 20006
      Attorney for Amici Curiae-Petitioners,
      Center for Democracy & Technology and
      Adam Thierer, Senior Fellow,
      The Progress & Freedom Foundation

NANCY WINKELMAN, ESQUIRE
Schnader Harrison Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
      Attorney for Amici Curiae-Petitioners,
      Former FCC Officials Henry Geller
      and Glen O. Robinson

ANDREW J. SCHWARTZMAN, ESQUIRE
Media Access Project
1625 K Street, N.W., Suite 1118
Washington, D.C. 20006

   Attorney for Amicus Curiae-Petitioner,
   Center for Creative Voices in Media, Inc.

CARTER G. PHILLIPS, ESQUIRE
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
   Attorney for Amicus Curiae-Petitioner,
   Fox Television Stations, Inc.

CHRISTOPHER T. CRAIG, ESQUIRE
Sparks & Craig LLP
6862 Elm Street, Suite 360
McLean, Virginia 22101
   Attorney for Amicus Curiae-Respondent,
   Parents Television Council, Inc.

THOMAS B. NORTH
   Pro Se Amicus Curiae-Respondent

DAVID P. AFFINITO, ESQUIRE
Dell'Italia Affinito & Santola
18 Tony Galento Plaza
Orange, New Jersey 07050
   Attorney for Amicus Curiae-Respondent,
   Morality In Media, Inc.

## OPINION OF THE COURT

SCIRICA, *Chief Judge*.

In this petition for review, CBS appeals orders of the Federal Communications Commission imposing a monetary forfeiture under 47 U.S.C. § 503(b) for the broadcast of "indecent" material in violation of 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999. The sanctions stem from CBS's live broadcast of the Super Bowl XXXVIII Halftime Show, in which two performers deviated from the show's script resulting in the exposure of a bare female breast on camera, a deceitful and manipulative act that lasted nine-sixteenths of one second. CBS transmitted the image over public airwaves, resulting in punitive action by the FCC.

CBS challenges the Commission's orders on constitutional, statutory, and public policy grounds. Two of the challenges are paramount: (1) whether the Commission acted arbitrarily and capriciously under the Administrative Procedure Act, 5 U.S.C. § 706, in determining that CBS's broadcast of a fleeting image of nudity was actionably indecent; and (2) whether the Commission, in applying three theories of liability – traditional *respondeat superior* doctrine, an alternative theory of vicarious liability based on CBS's duties as a broadcast licensee, and the "willfulness" standard of the forfeiture statute

5

– properly found CBS violated the indecency provisions of 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999. We will vacate the FCC's orders and remand for further proceedings consistent with this opinion.

**I.**

On February 1, 2004, CBS presented a live broadcast of the National Football League's Super Bowl XXXVIII, which included a halftime show produced by MTV Networks.[1] Nearly 90 million viewers watched the Halftime Show, which began at 8:30 p.m. Eastern Standard Time and lasted about fifteen minutes. The Halftime Show featured a variety of musical performances by contemporary recording artists, with Janet Jackson as the announced headlining act and Justin Timberlake as a "surprise guest" for the final minutes of the show.

Timberlake was unveiled on stage near the conclusion of the Halftime Show. He and Jackson performed his popular song "Rock Your Body" as the show's finale. Their performance, which the FCC contends involved sexually suggestive choreography, portrayed Timberlake seeking to dance with Jackson, and Jackson alternating between accepting and rejecting his advances. The performance ended with Timberlake singing, "gonna have you naked by the end of this song," and simultaneously tearing away part of Jackson's bustier. CBS had

---

[1]At that time, both CBS and MTV Networks were divisions of Viacom, Inc.

6

implemented a five-second audio delay to guard against the possibility of indecent language being transmitted on air, but it did not employ similar precautionary technology for video images. As a result, Jackson's bare right breast was exposed on camera for nine-sixteenths of one second.

Jackson's exposed breast caused a sensation and resulted in a large number of viewer complaints to the Federal Communications Commission.[2] In response, the Commission's Enforcement Bureau issued a letter of inquiry asking CBS to provide more information about the broadcast along with a video copy of the entire Super Bowl program. CBS supplied the requested materials, including a script of the Halftime Show, and issued a public statement of apology for the incident. CBS stated Jackson and Timberlake's wardrobe stunt was unscripted

_____

[2]The record is unclear on the actual number of complaints received from unorganized, individual viewers. In its brief, the FCC asserts it received "'an unprecedented number' of complaints about the nudity broadcast during the halftime show." FCC Br. at 12 (citation omitted). CBS disputes the calculation and significance of the viewer complaints. *See* CBS Reply Br. at 15 n.6 ("Of the 'over 542,000 complaints concerning the broadcast' the FCC claims to have received, over 85 percent are form complaints generated by single-interest groups. Approximately twenty percent of the complaints are duplicates, with some individual complaints appearing in the record up to 37 times." (citations omitted)).

and unauthorized, claiming it had no advance notice of any plan by the performers to deviate from the script.

On September 22, 2004, the Commission issued a Notice of Apparent Liability finding CBS had apparently violated federal law and FCC rules restricting the broadcast of indecent material. After its review, the Commission determined CBS was apparently liable for a forfeiture penalty of $550,000.[3] CBS submitted its Opposition to the Notice of Apparent Liability on November 5, 2004.

The Commission issued a forfeiture order over CBS's opposition on March 15, 2006, imposing a forfeiture penalty of $550,000. *In re Complaints Against Various Television Licensees Concerning Their February 1, 2004 Broadcast of the Super Bowl XXXVIII Halftime Show*, 21 F.C.C.R. 2760 (2006) ("*Forfeiture Order*"). Affirming its preliminary findings, the Commission concluded the Halftime Show broadcast was indecent because it depicted a sexual organ and violated "contemporary community standards for the broadcast medium." *Id*. at ¶ 10. In making this determination, the FCC relied on a contextual analysis to find the broadcast of Jackson's exposed

---

[3]This figure represented the aggregate of proposed penalties against individual CBS stations. At the time the Commission issued its Notice of Apparent Liability, forfeiture penalties for indecency violations were statutorily capped at $27,500. The Commission proposed the maximum penalty for each CBS station.

breast was: (1) graphic and explicit, (2) shocking and pandering, and (3) fleeting. *Id*. at ¶ 14. It further concluded that the brevity of the image was outweighed by the other two factors. *Id*. The standard applied by the Commission is derived from its 2001 policy statement setting forth a two-part test for indecency: (1) "the material must describe or depict sexual or excretory organs or activities," and (2) it must be "*patently offensive* as measured by contemporary community standards for the broadcast medium." *In re Industry Guidance on the Commission's Case Law Interpreting 18 U.S.C. § 1464 and Enforcement Policies Regarding Broadcast Indecency*, 16 F.C.C.R. 7999, 8002 ¶¶ 7-8 (2001) (emphasis in original). The Commission had informed broadcasters in its 2001 policy statement that in performing the second step of the test – measuring the offensiveness of any particular broadcast – it would look to three factors: "(1) the explicitness or graphic nature of the description or depiction of sexual or excretory organs or activities; (2) whether the material dwells on or repeats at length descriptions of sexual or excretory organs or activities; (3) whether the material appears to pander or is used to titillate, or whether the material appears to have been presented for its shock value." *Id*. at ¶ 10 (emphasis omitted).

Additionally, the FCC determined CBS's actions in broadcasting the indecent image were "willful" and therefore sanctionable by a monetary forfeiture under 47 U.S.C. § 503(b)(1). *See id*. at ¶ 15. Adopting the definition of "willful" found in section 312(f)(1) of the Communications

Act,[4] the Commission offered three explanations for its determination of willfulness. *Id*. First, the FCC found CBS "acted willfully because it consciously and deliberately broadcast the halftime show, whether or not it intended to broadcast nudity . . . ." *Id*. Second, the FCC found CBS acted willfully because it "consciously and deliberately failed to take reasonable precautions to ensure that no actionably indecent material was broadcast." *Id*. Finally, the FCC applied a *respondeat superior* theory in finding CBS vicariously liable for the willful actions of its agents, Jackson and Timberlake. *Id*.

On April 14, 2006, CBS submitted a Petition for Reconsideration under 47 C.F.R. § 1.106, raising several arguments against the Commission's findings and conclusions. In its Order on Reconsideration, the FCC rejected CBS's statutory and constitutional challenges and reaffirmed its imposition of a $550,000 forfeiture. *In re Complaints Against Various Television Licensees Concerning Their February 1, 2004 Broadcast of the Super Bowl XXXVIII Halftime Show*, 21 F.C.C.R. 6653 (2006) ("*Reconsideration Order*"). The

---

[4]This section of the Communications Act provides: "The term 'willful', when used with reference to the commission or omission of any act, means the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this Act or any rule or regulation of the Commission authorized by this Act or by a treaty ratified by the United States." 47 U.S.C. § 312(f)(1).

*Reconsideration Order* revised the Commission's approach for determining CBS's liability under the willfulness standard. The Commission reiterated its application of vicarious liability in the form of *respondeat superior* and its determination that CBS was directly liable for failing to take adequate measures to prevent the broadcast of indecent material. *See id*. at ¶ 16. But it abandoned its position that CBS acted willfully under 47 U.S.C. § 503(b)(1) by intentionally broadcasting the Halftime Show irrespective of its intent to broadcast the particular content included in the show. Instead, it determined CBS could be liable "given the nondelegable nature of broadcast licensees' responsibility for their programming." *Id*. at ¶ 23. The Commission has since elaborated on this aspect of the *Reconsideration Order*, explaining it as a separate theory of liability whereby CBS can be held vicariously liable even for the acts of its independent contractors because it holds non-delegable duties as a broadcast licensee to operate in the public interest and to avoid broadcasting indecent material. *See, e.g.*, FCC Br. at 44-45.

CBS timely filed a petition for review of the *Reconsideration Order* on July 28, 2006. It challenges the FCC's orders on several grounds, and both parties are supported by briefing from several amici.

## II.

Our standard of review of agency decisions is governed by the Administrative Procedure Act, 5 U.S.C. § 706. Under the

Administrative Procedure Act, we "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* § 706(2)(A); *see, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983).

The scope of review under the "arbitrary and capricious" standard is "narrow, and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Nevertheless, the agency must reach its decision by "examin[ing] the relevant data," and it must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). We generally find agency action arbitrary and capricious where:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.

*Id.* at 43 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Our review of the constitutional questions is more searching. In cases raising First Amendment issues, we have "an obligation 'to make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *United States v. Various Articles of Merch., Schedule No. 287*, 230 F.3d 649, 652 (3d Cir. 2000) (quoting *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984) (citations omitted)).

**III.**

The FCC possesses authority to regulate indecent broadcast content, but it had long practiced restraint in exercising this authority. During a span of nearly three decades, the Commission frequently declined to find broadcast programming indecent, its restraint punctuated only by a few occasions where programming contained indecent material so pervasive as to amount to "shock treatment" for the audience. Throughout this period, the Commission consistently explained that isolated or fleeting material did not fall within the scope of actionable indecency.

At the time the Halftime Show was broadcasted by CBS, the FCC's policy on fleeting material was still in effect. The FCC contends its restrained policy applied only to fleeting utterances – specifically, fleeting expletives – and did not extend

13

to fleeting images.  But a review of the Commission's enforcement history reveals that its policy on fleeting material was never so limited.  The FCC's present distinction between words and images for purposes of determining indecency represents a departure from its prior policy.

Like any agency, the FCC may change its policies without judicial second-guessing.  But it cannot change a well-established course of action without supplying notice of and a reasoned explanation for its policy departure.  Because the FCC failed to satisfy this requirement, we find its new policy arbitrary and capricious under the Administrative Procedure Act as applied to CBS.

**A.**

Section 326 of the Communications Act prohibits the FCC from censoring its licensees' broadcasts.[5]  Subject to this constraint, the FCC retains authority to regulate obscene, indecent, or profane broadcast content.  *See* 18 U.S.C. § 1464 ("Whoever utters any obscene, indecent, or profane language by

---

[5] *See* 47 U.S.C. § 326 ("Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication.").

14

means of radio communication shall be fined under this title or imprisoned not more than two years, or both."). Indecency and obscenity are distinct categories of speech. *See FCC v. Pacifica Found.*, 438 U.S. 726, 739-41 (1978) (plurality opinion) ("*Pacifica*"). Indecency, unlike obscenity, is protected by the First Amendment. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). The FCC's authority to restrict indecent broadcast content is nevertheless constitutionally permissible because of the unique nature of the broadcast medium. *Pacifica*, 438 U.S. at 750-51; *see also id*. at 755-56 (Powell, J., concurring).

Congress authorized the FCC to impose forfeiture penalties for violations of 18 U.S.C. § 1464 in 1960.[6] But the FCC did not exercise its authority to find a broadcast statutorily "indecent" until 1975, when it issued a forfeiture penalty against Pacifica Foundation for broadcasting comedian George Carlin's "Filthy Words" monologue. *See In re Citizen's Complaint Against Pacifica Found., Station WBAI(FM), N.Y., N.Y.*, 56 F.C.C.2d 94 (1975). Carlin's monologue, which Pacifica aired on the radio in an early-afternoon time slot, contained extensive and repetitive use of several vulgar expletives over a period of twelve minutes. *See Pacifica*, 438 U.S. at 739.

---

[6]*See* 47 U.S.C. § 503(b)(1)(D) ("Any person who is determined by the Commission . . . to have . . . violated any provision of section . . . 1464 of title 18 . . . shall be liable to the United States for a forfeiture penalty.").

15

Pacifica appealed the FCC's forfeiture order to the United States Court of Appeals for the D.C. Circuit. The FCC issued a clarification order while Pacifica's appeal was pending, expressly limiting its prior forfeiture order to the specific facts of the Carlin monologue. *In re 'A Petition for Clarification or Reconsideration' of a Citizen's Complaint Against Pacifica Found., Station WBAI(FM), N.Y., N.Y.*, 59 F.C.C.2d 892 (1976) ("*Pacifica Clarification Order*"). Expressly acknowledging the forfeiture order's potential negative impact on broadcast coverage of live events where "there is no opportunity for journalistic editing," the FCC stated its intention to exclude such circumstances from the scope of actionable indecency. *Id*. at ¶ 4 n.1.

Following the *Pacifica Clarification Order*, the D.C. Circuit reversed the FCC's forfeiture order against Pacifica as vague and overbroad and found the agency's indecency regime constituted invalid censorship under 47 U.S.C. § 326. *Pacifica Found. v. FCC*, 556 F.2d 9, 14 (D.C. Cir. 1977). The FCC appealed and the Supreme Court reversed in a narrow plurality opinion. *See Pacifica*, 438 U.S. at 726. The Court rejected Pacifica's statutory argument that the term "indecent" in 18 U.S.C. § 1464 only covered obscene speech. *Pacifica*, 438 U.S. at 739. But the Court confirmed the general validity of the FCC's indecency regime, "emphasiz[ing] the narrowness of [its] holding," which it confined to the facts of the Carlin monologue. *Id*. at 750. Justices Powell and Blackmun concurred in the judgment, writing separately in part to reiterate the narrowness

16

of the decision and to note the Court's holding did not "speak to cases involving the isolated use of a potentially offensive word in the course of a radio broadcast, as distinguished from the verbal shock treatment administered by respondent here." *Id*. at 760-61 (Powell, J., concurring).

Shortly after the Court's ruling in *Pacifica*, a broadcaster's license renewal was challenged on the basis that the broadcaster had aired indecent programming. *See In re Application of WGBH Educ. Found.*, 69 F.C.C.2d 1250 (1978) ("*WGBH*"). Viewer complaints alleged the broadcaster aired several programs containing nudity and other allegedly offensive material. *Id*. at ¶ 2. Distinguishing the facts of *WGBH* from the Court's ruling in *Pacifica*, the FCC rejected the challenge and denied that *Pacifica* afforded it any "general prerogative to intervene in any case where words similar or identical to those in *Pacifica* are broadcast over a licensed radio or television station." *Id*. at ¶ 10. The FCC, noting it "intend[ed] strictly to observe the narrowness of the *Pacifica* holding" and emphasizing the language in Justice Powell's concurring opinion, *id*. at ¶ 10, concluded the single use of an expletive in a program "should not call for us to act under the holding of *Pacifica*." *Id*. at ¶ 10 n.6.

The FCC's restrained enforcement policy continued in the years following *Pacifica*. Rejecting another challenge to a broadcaster's license renewal based on the airing of allegedly indecent material, the FCC reaffirmed that isolated use of expletives in broadcasts did not constitute actionable indecency

17

under 18 U.S.C. § 1464. *See In re Application of Pacifica Found.*, 95 F.C.C.2d 750 (1983). The complaint alleged the broadcaster had on multiple occasions aired programming containing language such as "motherfucker," "fuck," and "shit." *Id*. at ¶ 16. The FCC held these facts did not constitute a prima facie showing of actionable indecency under 18 U.S.C. § 1464, because the complainant had failed to show the broadcasts amounted to "verbal shock treatment" as opposed to "isolated use." *Id*. at ¶ 18.

In April 1987, the FCC issued three simultaneous indecency decisions. *See In re Pacifica Found., Inc.*, 2 F.C.C.R. 2698 (1987); *In re Regents of the Univ. of Cal.*, 2 F.C.C.R. 2703 (1987); *In re Infinity Broad. Corp.*, 2 F.C.C.R. 2705 (1987). These decisions reaffirmed the Commission's restrained enforcement policy and reiterated the agency's policy that isolated or fleeting material would not be considered actionably indecent. *See, e.g., Regents of the Univ. of Cal.* at ¶ 3 ("Speech that is indecent must involve more than an isolated use of an offensive word.").

Later in 1987, reconsidering these decisions, the Commission abandoned the view that only the particular "dirty words" used in the Carlin monologue could be indecent.[7]

---

[7] *See In re Infinity Broad. Corp.*, 3 F.C.C.R. 930, ¶ 5 (1987), *vacated in part on other grounds*, *Action for Children's Television v. FCC*, 852 F.2d 1332, 1337 (D.C. Cir. 1988) ("*ACT I*"), *superseded by Action for Children's Television v. FCC*, 58

Instead, the FCC explained it would thereafter rely on the broader terms of its generic indecency standard, which defined indecent material as "language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities or organs, when there is a reasonable risk that children may be in the audience." *Id*. at ¶¶ 2, 5.[8] Even so, the FCC affirmed all three decisions on reconsideration, never indicating disagreement with those decisions' express statements that isolated or fleeting material could not be actionably indecent. *Id*.

---

F.3d 654 (D.C. Cir. 1995) (en banc) ("*ACT II*").

[8]As described in greater detail *infra*, subsequent litigation determined what time of day broadcasters could reasonably air indecent programming without expecting children to be in the audience. The D.C. Circuit Court of Appeals rejected a total ban on indecency, instructing the FCC to identify a precise time period during which broadcasters could air indecent material. *See ACT I*, *supra*. In response, the Commission adopted the safe-harbor rule of 47 C.F.R. § 73.3999. After further instruction from the D.C. Circuit in 1995, *ACT II*, *supra*, the Rule was amended to its current form, which confines enforcement of indecency restrictions to the hours "between 6:00 a.m. and 10:00 p.m." *See* 47 C.F.R. § 73.3999; *In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. § 1464*, 10 F.C.C.R. 10558 (1995).

In 2001, the broadcast industry sought clarification of the policies and rules of the FCC's indecency enforcement regime. Guidance for the industry came in the form of a policy statement issued by the Commission. *See Industry Guidance on the Commission's Case Law Interpreting 18 U.S.C. § 1464 and Enforcement Policies Regarding Broadcast Indecency*, 16 F.C.C.R. 7999, ¶ 19 (2001) ("*Industry Guidance*"). The policy statement included multiple examples of FCC rulings as "case comparisons" highlighting the factors that had proved significant in prior indecency determinations. One of the factors noted as leading to prior determinations that a program was not actionably indecent was the "fleeting or isolated" nature of potentially indecent material in the context of the overall broadcast. *See id.* at ¶¶ 17-18.

Soon after the Commission's issuance of the *Industry Guidance* policy statement, its restrained enforcement policy changed. In an unscripted remark during a live NBC broadcast of the Golden Globe Awards on January 19, 2003, musician Bono said "this is really, really fucking brilliant" while accepting an award. *See In re Complaints Against Various Broadcast Licensees Regarding Their Airing of the "Golden Globe Awards" Program*, 19 F.C.C.R. 4975, ¶ 3 n.4 (2004) ("*Golden Globes*"). Viewers complained to the FCC about Bono's speech, but the Commission's Enforcement Bureau rejected the complaints in part because the utterance was fleeting and isolated and therefore did "not fall within the scope of the Commission's indecency prohibition." *See In re*

20

*Complaints Against Various Broadcast Licensees Regarding Their Airing of the "Golden Globe Awards" Program*, 18 F.C.C.R. 19859, ¶ 6 (FCC Enforcement Bureau 2003). The Enforcement Bureau specifically reaffirmed that "fleeting and isolated remarks of this nature do not warrant Commission action." *Id*.

On March 3, 2004, the full Commission reversed the Enforcement Bureau's decision. *See generally Golden Globes*, *supra*. Although the FCC acknowledged the existence of its restrained enforcement policy for isolated or fleeting utterances, it overruled all of its prior cases holding such instances not actionable. *Id*. at ¶ 12 ("While prior Commission and staff action have indicated that isolated or fleeting broadcasts of the 'F-Word' such as that here are not indecent or would not be acted upon, consistent with our decision today we conclude that any such interpretation is no longer good law."). But the Commission made it clear that licensees could not be held liable for broadcasting fleeting or isolated indecent material prior to its *Golden Globes* decision. *See id.* at ¶ 15 & n.40 (declining to impose a forfeiture penalty because "existing precedent would have permitted [the Golden Globe Awards] broadcast" and therefore it would be "inappropriate" to sanction licensees for conduct prior to notice of policy change).[9]

---

[9]The Commission also cited *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618 (D.C. Cir. 2000), explaining that the court in *Trinity* "reversed [a] Commission decision that denied a

The FCC's new indecency policy created in *Golden Globes* was soon challenged by the broadcast industry. On February 21, 2006, the Commission issued an omnibus order resolving multiple indecency complaints against television broadcasters in an effort to "provide substantial guidance to broadcasters and the public about the types of programming that are impermissible under our indecency standard." *In re Complaints Regarding Various Television Broadcats Between February 2, 2002 and March 8, 2005*, 21 F.C.C.R. 2664, ¶ 2 (2006) ("*Omnibus Order*"). The *Omnibus Order* found four programs indecent and profane: (1) Fox's broadcast of the 2002 Billboard Music Awards, in which performer Cher used an unscripted expletive during her acceptance speech; (2) Fox's broadcast of the 2003 Billboard Music Awards, in which presenter Nicole Richie used two unscripted expletives; (3) ABC's broadcast of various episodes of its NYPD Blue series, in which assorted characters used scripted expletives; and (4) a CBS broadcast of The Early Show, in which a guest used an unscripted expletive during a live interview. *Id*. at ¶¶ 101, 112 n.64, 125, 137. Applying its policy announced in *Golden Globes*, the Commission found the broadcasts indecent despite the fleeting and isolated nature of the offending expletives. *Id*. at ¶¶ 104, 116, 129, 140.

renewal application for abuse of process in connection with the Commission's minority ownership rules because the court found the Commission had not provided sufficiently clear notice of what those rules required." *Golden Globes* at ¶ 15 n.40.

22

As in *Golden Globes*, the Commission recognized the inequity in retroactively sanctioning the conduct of broadcast licensees. Because the offending broadcasts occurred prior to the issuance of its *Golden Globes* decision, the FCC concluded that existing precedent would have permitted the broadcasts. *Id*. Accordingly, the FCC did not issue forfeiture orders against any of the licensees. *Id*. at ¶¶ 111, 124, 136, 145.

The networks appealed the *Omnibus Order*, and the cases were consolidated before the United States Court of Appeals for the Second Circuit. Granting a request by the FCC, the court remanded the matter to allow the Commission an opportunity to address the petitioners' arguments. After soliciting public comment, the FCC issued a new order on November 6, 2006, reaffirming its indecency findings against Fox for the 2002 and 2003 Billboard Music Awards but reversing its finding against CBS for The Early Show broadcast and dismissing the complaint against ABC on procedural grounds. *See In re Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005*, 21 F.C.C.R. 13299 (2006) ("*Fox Remand Order*").

The networks' original appeal to the Second Circuit was reinstated on November 8, 2006, and consolidated with a petition for review of the *Fox Remand Order*. *Fox Television Stations, Inc. v. FCC*, 489 F.3d 444, 454 (2d Cir. 2007) ("*Fox*"), *cert. granted*, 76 U.S.L.W. 3490 (U.S. Mar. 17, 2008) (No. 07-582). The court granted motions to intervene by other networks, including CBS, and the networks collectively raised several

23

challenges to the validity of the *Fox Remand Order* essentially mirroring those raised in this case. *See Fox*, 489 F.3d at 454.

Undertaking a thorough review of the history of the FCC's indecency regime similar to that which we engage in here, the Second Circuit found the FCC's "consistent enforcement policy" prior to the *Golden Globes* decision excluded fleeting or isolated expletives from regulation. *Id*. at 455. The court concluded "there is no question" that the FCC changed its policy with respect to fleeting expletives, and that the policy "changed with the issuance of *Golden Globes*." *Id*. (citations omitted). Judge Leval, dissenting in *Fox* for other reasons, agreed with the majority's conclusion that the FCC changed its position on fleeting utterances, although he considered the change of standard "relatively modest." *See id*. at 469 (Leval, J., dissenting); *see also id*. at 470 (Leval, J., dissenting) (stating that the FCC changed its position and finding that the FCC clearly acknowledges that its *Golden Globes* and *Fox Remand Order* rulings were not consistent with its prior standard). We agree that the *Golden Globes* decision represented a policy departure by the FCC. The extensive history detailed above demonstrates a consistent and entrenched policy of excluding fleeting broadcast material from the scope of actionable indecency.

In spite of this history, the FCC contends that by February 1, 2004 (the date of the Halftime Show), a broadcaster in CBS's position should have known that even isolated or fleeting indecent material in programming could be actionable.

24

Despite its announced reversal of prior policy in its *Golden Globes* decision on March 3, 2004, the Commission points to one sentence in its 2001 policy statement to support its position: "[E]ven relatively fleeting references may be found indecent where other factors contribute to a finding of patent offensiveness." *Industry Guidance* at ¶ 19.[10] But when read in

---

[10]In its 2001 policy statement, the Commission described the "principal factors that have proved significant in [its] decisions to date" as: "(1) the *explicitness or graphic nature* of the description or depiction of sexual or excretory organs or activities; (2) whether the material *dwells on or repeats at length* descriptions of sexual or excretory organs or activities; (3) *whether the material appears to pander or is used to titillate*, or *whether the material appears to have been presented for its shock value*." *Industry Guidance* at ¶ 10 (emphasis in original). It has since contended that its fleeting material policy was no policy at all, asserting instead that the fleeting nature of material was only a consideration under the second factor and could be outweighed by the other two factors depending on the specific facts of a case. But as we detail *infra*, this assertion contradicts the history of the Commission's indecency enforcement regime and is foreclosed by the agency's admissions in *Golden Globes* and *Fox*, which are controlling here, that its prior policy was to exclude fleeting material from the scope of actionable indecency. Although the FCC disputes the breadth of its policy, now contending the policy was limited only to fleeting expletives or alternatively to fleeting utterances, the fleeting

25

its original context rather than as an isolated statement, this sentence does not support the Commission's assertion here. The "relatively fleeting references" identified by that sentence are distinguishable from the truly "fleeting" broadcast material the FCC had included in its fleeting material policy. The paragraph cites, for instance, a notice of apparent liability against WEZB-FM, New Orleans, to exemplify the kind of "relatively fleeting references" the FCC considered actionably indecent. *See id*. (citing *EZ New Orleans, Inc. (WEZB(FM))*, 12 F.C.C.R. 4147 (MMB 1997) ("*WEZB-FM NAL*")). The citation to *WEZB-FM NAL* specifically describes as indecent an "announcer joke" involving incest, forceful sexual contact with children, and a reference to cleaning "blood off [a] diaper." *Id*. The "announcer joke" is distinguishable on its face from "fleeting" material such as a brief glimpse of nudity or isolated use of an expletive. Moreover, the "announcer joke" was merely one incident among dozens included in a transcript supporting the forfeiture liability determination in the *WEZB-FM NAL*.[11]

---

nature of broadcast material was unquestionably treated by the FCC as more than one of several contextual factors subject to balancing.

[11]The *WEZB-FM NAL* found a broadcast licensee apparently liable for a forfeiture penalty of $12,000 for its broadcast of indecent material during six radio broadcasts spanning fourteen hours of airtime over nearly a one year period. The *WEZB-FM NAL* provides transcript excerpts from these broadcasts, which

26

Nevertheless, as it clarified at oral argument, the FCC relies on its 2001 *Industry Guidance* to contend its policy on fleeting or isolated material "was a policy with respect to cases relying solely on the use of expletives." As the Commission explained at oral argument, "[t]here was not a policy that all short utterances were exempt." This reading of the Commission's policy on fleeting material is untenable. Even the FCC's *Industry Guidance* fails to support such a narrow characterization. *See*, *e.g.*, *Industry Guidance* at ¶ 18 (quoting *L.M. Commc'ns of S. C., Inc. (WYBB(FM))*, 7 F.C.C.R. 1595 (MMB 1992), for the proposition that "'a fleeting or isolated utterance . . . , within the context of live and spontaneous programming, does not warrant a Commission sanction.'").

Accordingly, we find the Commission's unsubstantiated contentions in this regard contradict the lengthy history of the Commission's restrained enforcement policy. While "an agency's interpretation of its own precedent is entitled to deference," *Cassel v. FCC*, 154 F.3d 478, 483 (D.C. Cir. 1998), deference is inappropriate where the agency's proffered interpretation is capricious. Until its *Golden Globes* decision in March of 2004, the FCC's policy was to exempt fleeting or

---

involved very graphic segments discussing a variety of sexual topics in extended detail. The "announcer joke" included in the FCC's *Industry Guidance* was merely one of these factual predicates for the broadcast licensee's forfeiture liability for indecency.

27

isolated material from the scope of actionable indecency. Because CBS broadcasted the Halftime Show prior to *Golden Globes*, this was the policy in effect when the incident with Jackson and Timberlake occurred.

**B.**

If the FCC's restrained enforcement policy for fleeting broadcast material was intact until the *Golden Globes* decision in March of 2004, our inquiry would end with a simple examination of the chronology of the FCC's actions. CBS broadcasted the Halftime Show more than a month prior to *Golden Globes*. The Commission's orders here would amount to a retroactive application of the new policy it announced in *Golden Globes,* which would raise due process concerns. The Commission has recognized the inequity in such an outcome. *See Omnibus Order*, *supra*, at ¶¶ 111, 124, 136, 145 (declining to issue forfeiture orders because the offending broadcasts occurred prior to the issuance of its *Golden Globes* decision, and therefore "existing precedent would have permitted [the] broadcasts"); *see also Trinity Broad. of Fla., Inc.*, 211 F.3d at 628 ("Because '[d]ue process requires that parties receive fair notice before being deprived of property,' we have repeatedly held that '[i]n the absence of notice–for example, where the regulation is not sufficiently clear to warn a party about what is expected of it–an agency may not deprive a party of property by imposing civil or criminal liability.'" (citation omitted)).

But the FCC urges another reading of *Golden Globes*, perhaps less obvious yet still plausible, which interprets *Golden Globes* as addressing only the broadcast of fleeting expletives, not other fleeting material such as brief images of nudity. Further, the Commission contends its fleeting material policy, as initially adopted, was limited to fleeting words and did not extend to fleeting images. Under this view, *Golden Globes* would be inapposite here – the Commission's sanction against CBS would be in line with its treatment of images as part of its historical indecency enforcement regime. If, as the FCC contends, *Golden Globes* was limited to fleeting expletives, then its orders issuing forfeiture penalties in this case did not constitute a retroactive application of the policy change in *Golden Globes*.

But even if we accept the FCC's interpretation of *Golden Globes* and read it as only addressing fleeting expletives, the Commission's view of the scope of its fleeting materials policy prior to *Golden Globes* is unsustainable. As we will explain, the Commission – before *Golden Globes* – had not distinguished between categories of broadcast material such as images and words. Accordingly, even if, as the FCC contends, *Golden Globes* only addressed expletives, it nevertheless represented the first time the Commission distinguished between formats of broadcast material or singled out any one category of material for special treatment under its fleeting material policy. That is, it altered the scope of the FCC's fleeting material policy by excising only one category of fleeting material – fleeting

29

expletives – from the policy. And it therefore did not constitute an abdication of its fleeting material policy. Rather, a residual policy on other categories of fleeting material – including all broadcast content other than expletives – remained in effect.

Accordingly, subsequent agency action was required to change the fleeting material policy as it applied to broadcast content other than expletives. By targeting another category of fleeting material – fleeting images – in its orders against CBS in this case, the FCC apparently sought to further narrow or eliminate the fleeting material policy as it existed following *Golden Globes*. The Commission's determination that CBS's broadcast of a nine-sixteenths of one second glimpse of a bare female breast was actionably indecent evidenced the agency's departure from its prior policy. Its orders constituted the announcement of a policy change – that fleeting images would no longer be excluded from the scope of actionable indecency.

The question is whether the FCC's departure from its prior policy is valid and enforceable as applied to CBS. As noted, agencies are free to change their rules and policies without judicial second-guessing. *See*, *e.g.*, *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 863 (1984). But an agency cannot ignore a substantial diversion from its prior policies. *See Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) (agency must "provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored"). As the Supreme Court explained in *State Farm*, an agency must be afforded great

30

latitude to change its policies, but it must justify its actions by articulating a reasoned analysis behind the change:

> Petitioner . . . contend[s] that the rescission of an agency rule should be judged by the same standard a court would use to judge an agency's refusal to promulgate a rule in the first place–a standard Petitioner believes considerably narrower than the traditional arbitrary and capricious test and "close to the borderline of nonreviewability." We reject this view. . . . Petitioner's view would render meaningless Congress' authorization for judicial review of orders revoking . . . rules. Moreover, the revocation of an extant regulation is substantially different than a failure to act. Revocation constitutes a reversal of the agency's former views as to the proper course. A "settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to." Accordingly, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."

31

463 U.S. at 42-43 (citations omitted).

The agency's obligation to supply a reasoned analysis for a policy departure requires an affirmative showing on record. It "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id*. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). A reviewing court "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id*. (citations omitted). The agency's actions will then be set aside as "arbitrary and capricious" if the agency failed to provide a "reasoned explanation" for its decision to change course. *Massachusetts v. EPA*, — U.S. —, 127 S.Ct. 1438, 1463 (2007); *see State Farm*, 463 U.S. at 42-43; *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("unexplained inconsistency" in agency practice is a reason for holding a policy reversal "arbitrary and capricious" under the APA, unless "the agency adequately explains the reasons for a reversal of policy").

In *Fox*, the Second Circuit analyzed the FCC's changed policy on fleeting expletives under *State Farm*,[12] but the panel

_____

[12]It was undisputed that the FCC changed its policy on fleeting expletives in *Golden Globes*, which was decided prior to *Fox*. But as the *Fox* court explained, the actual moment the agency changed its course was not pertinent in determining

32

split on the outcome of its analysis. Judge Pooler, writing for the majority, found the policy change arbitrary and capricious because the FCC failed to provide a reasoned explanation for the change. *Fox*, 489 F.3d at 455 ("The Networks contend that the Remand Order is arbitrary and capricious because the FCC has made a 180-degree turn regarding its treatment of 'fleeting expletives' without providing a reasoned explanation justifying the about-face. We agree."). Scrutinizing the sufficiency of the Commission's explanation for its policy change, the court

whether the change was valid under *State Farm*:

> [W]e . . . reject the FCC's contention that our review here is narrowly confined to the specific question of whether the two Fox broadcasts . . . were indecent. The [*Fox Remand Order*] applies the policy announced in *Golden Globes*. If that policy is invalid, then we cannot sustain the indecency findings against Fox. Thus, as the Commission conceded during oral argument, the validity of the new "fleeting expletive" policy announced in *Golden Globes* and applied in the [*Fox Remand Order*] is a question properly before us on this petition for review.

*Fox*, 489 F.3d at 454. To hold otherwise would create a situation ripe for manipulation by an agency. *Cf. ACT I*, *supra*, 852 F.2d at 1337 ("[A]n agency may not resort to [ad hoc] adjudication as a means of insulating a generic standard from judicial review.").

33

rejected the agency's proffered rationale as "disconnected from the actual policy implemented by the Commission." *Id*. at 459 n.8 (citation omitted).

Judge Leval, writing in dissent, also applied *State Farm*, but he disagreed with the amount of deference the majority afforded the FCC's policy decision. Although he agreed that the FCC was obligated to provide a reasoned explanation for its policy shift, he found the agency's explanation sufficient. As Judge Leval explained:

> In my view, in changing its position on the repetition of an expletive, the Commission complied with these requirements. It made clear acknowledgment that its *Golden Globes* and *Remand Order* rulings were not consistent with its prior standard regarding lack of repetition. It announced the adoption of a new standard. And it furnished a reasoned explanation for the change. Although one can reasonably disagree with the Commission's new position, its explanation . . . is not irrational, arbitrary, or capricious. The Commission thus satisfied the standards of the Administrative Procedure[] Act.

*Id*. at 470 (Leval, J., dissenting).

In this case, *State Farm* also provides the correct standard of review, but we need not engage in the substantive inquiry that divided the Second Circuit panel in *Fox*. There, as Judge Leval

34

noted in dissent, the FCC provided an explanation for changing its policy on fleeting expletives. The critical question splitting the court was whether that explanation was adequate under *State Farm*. Here, unlike in *Fox*, the FCC has not offered any explanation – reasoned or otherwise – for changing its policy on fleeting images. Rather, the FCC asserts it never had a policy of excluding fleeting images from the scope of actionable indecency, and therefore no policy change occurred when it determined that the Halftime Show's fleeting image of Janet Jackson's breast was actionably indecent. Accordingly, we must determine whether the FCC's characterization of its policy history is accurate. If it is not, then the FCC's policy change must be set aside as arbitrary and capricious, because it has failed to even acknowledge its departure from its former policy let alone supply a "reasoned explanation" for the change as required by *State Farm*.

CBS contends the FCC's indecency regime treated words and images alike, so the exception for fleeting material applied with equal force to words and images. The Commission rejects this assertion, contending its prior policy on fleeting material was limited to words alone. Although the FCC acknowledges it had never explicitly distinguished between images and words for the purpose of defining the scope of actionable indecency, it

35

contends the existence of such a distinction was obvious, even if unstated.[13]

The Commission's conclusion on the nature and scope of its indecency regime – including its fleeting material policy – is at odds with the history of its actions in regulating indecent broadcasts. In the nearly three decades between the Supreme Court's ruling in *Pacifica* and CBS's broadcast of the Halftime

---

[13]The FCC's position is difficult to reconcile with the source of its authority to regulate broadcast content. The text of 18 U.S.C. § 1464 provides: "Whoever *utters* any obscene, indecent, or profane *language* by means of radio communication shall be fined under this title or imprisoned not more than two years, or both." *Id*. (emphasis added). Although the text on its face only reaches spoken words, it is applied broadly, as here, to reach all varieties of indecent content. But this broad interpretation of the text requires that the FCC treat words and images interchangeably in order to fit its regulation of indecent images within the boundaries of its statutory authority. Where the FCC's entire enforcement regime is built on the agency's treatment of words and images as functionally identical, it is unclear how the difference between words and images is "obvious." At minimum, the FCC cannot reasonably expect the difference between words and images to be so self-evident that broadcast licensees seeking to comply with indecency standards would interpret FCC enforcement orders narrowly based on whether the reviewed content consisted of words or images.

Show, the FCC had never varied its approach to indecency regulation based on the format of broadcasted content. Instead, the FCC consistently applied identical standards and engaged in identical analyses when reviewing complaints of potential indecency whether the complaints were based on words or images.

In 2000, for example, the FCC rejected a complaint of indecency based on scenes of nudity in a television broadcast of the film "Schindler's List." *In re WPBN/WTOM License Subsidiary, Inc.*, 15 F.C.C.R. 1838 (2000). Finding the broadcasted images not actionably indecent, the FCC noted "nudity itself is not *per se* indecent" and applied the identical indecency test the agency used to review potentially indecent language. *Id*. at ¶ 11. The Commission did not treat the nudity complaint differently – factually or legally – from a complaint for indecency based on a spoken utterance. *See id.* at ¶ 10 n.5 ("The Supreme Court has observed that contextual assessments may involve (and are not limited to) an examination of whether the actual *words or depictions* in context are, for example, vulgar or shocking, a review of the manner in which the *words or depictions* are portrayed, and an analysis of whether the allegedly *indecent material is isolated or fleeting*." (emphasis added)). The Commission even referred in a footnote to its policy towards fleeting material, never suggesting the policy would be inapplicable because the offending broadcast content was an image rather than a word. *See id.* at ¶ 5 n.10 (explaining that contextual assessments of whether certain programming is

37

patently offensive, and therefore actionably indecent, "may involve . . . analysis of whether the allegedly indecent material is isolated or fleeting").

The Commission took the same approach when reviewing viewer complaints against a television station for multiple broadcasts of programs containing expletives, nudity, and other allegedly indecent material. *See WGBH, supra.*[14] Categorically denying that the programming in *WGBH* was actionably indecent,[15] the FCC distinguished the facts of *WGBH*

---

[14]Among several broadcasts at issue in *WGBH* were: (1) "numerous episodes of *Monty Python's Flying Circus*, which allegedly consistently relie[d] primarily on scatology, immodesty, vulgarity, nudity, profanity and sacrilege for humor"; (2) "a program entitled *Rock Follies* . . . which [the petitioner] describe[d] as vulgar and as containing profanity" including "obscenities such as shit, bullshit, etc., and action indicating some sexually-oriented content in the program"; and (3) "other programs which allegedly contained nudity and/or sexually-oriented material." 69 F.C.C.R. 1250 at ¶ 2 (internal quotation marks omitted).

[15]The FCC contends *WGBH* is inapposite because it was a license revocation proceeding rather than a direct complaint for indecency. But its analysis in reaching its decision is instructive. Because the complainant in *WGBH* challenged the broadcaster's license based on a pattern of allegedly indecent

from the Carlin monologue in *Pacifica* by invoking its restrained enforcement policy for fleeting or isolated material. *See id.* at ¶ 10 ("We intend strictly to observe the narrowness of the *Pacifica* holding. . . . Justice Powell's concurring opinion . . . specifically distinguished 'the verbal shock treatment [in *Pacifica*]' from 'the isolated use of a potentially offensive word in the course of a radio broadcast.' . . . In the case before us, petitioner has made no comparable showing of abuse by WGBH-TV of its programming discretion."); *id.* at ¶ 10 n.6 (finding that WGBH-TV's programs "differ[ed] dramatically from the concentrated and repeated assault involved in *Pacifica*"). In its indecency analysis in *WGBH*, the FCC made no distinction between words and images (nudity or otherwise).

As evidence that the FCC's policy on fleeting material, as it existed at the time of the Halftime Show, did not distinguish between words and images, CBS presented several complaints viewers had submitted to the FCC about allegedly indecent broadcasts. CBS Letter Br., *submitted pursuant to* Fed R. App. P. 28(j) (Aug. 13, 2007). Accompanying each

broadcasts, the Commission expressly answered the threshold question of whether the broadcasts were indecent. Separate from the question of whether the broadcaster's actions were sufficient to revoke its license, the Commission's analysis illustrates that "words" and "depictions" were treated identically for purposes of determining whether a broadcast was actionably indecent.

complaint is a corresponding reply letter by the FCC rejecting the indecency allegation. Each complaint involves some variety of sexually explicit imagery. One letter, for example, describes the early-evening broadcast of a female adult dancer at a strip club and alleges the broadcast contained visible scenes of the woman nude from the waist down revealing exposed buttocks and "complete genital nudity" for approximately five to seven seconds. Another letter describes in part a Sunday-morning television broadcast of the movie "Devices and Desires," which included "scenes of a topless woman in bed with her lover, with her breast very clearly exposed, several scenes of a topless woman running on the beach, and several scenes of a nude female corpse, with the breasts clearly exposed."

Citing *Pacifica* and the indecency standard used to review the broadcast of potentially indecent language, the FCC summarily rejected each of these complaints as "not actionably indecent." The FCC contends these "form letters" are irrelevant, as the letters "do not even explain the grounds for the staff's conclusions that the broadcasts were not indecent, much less rely on the 'fleeting' nature of any alleged nudity as a reason for rejecting the complaints." FCC Letter Br., *submitted pursuant to* Fed R. App. P. 28(j) (Aug. 27, 2007). But the relevance of the FCC's rejection letters is not found in their specific reasons for finding the images not actionably indecent. Rather, the rejection letters illustrate that the FCC used the identical form letters and indecency analyses to address complaints of indecent

nudity that it had long used to address complaints of indecent language.

Confronted with this history of FCC enforcement of restrictions on broadcast indecency, the entirety of which reveals no distinction in treatment of potentially indecent images versus words, the FCC nevertheless finds such a distinction evident in its prior decisions. *See*, *e.g.*, FCC Br. at 26-27. To support this view, the FCC offers its Notice of Apparent Liability for Forfeiture in *In re Young Broadcasting of San Francisco, Inc.*, 19 F.C.C.R. 1751 (2004), issued four days before CBS's broadcast of the Halftime Show. *See Reconsideration Order* at ¶¶ 10, 36; FCC Br. at 26-27. *Young Broadcasting* involved a morning news show segment in which two performers from a production titled "Puppetry of the Penis" appeared in capes but were otherwise naked underneath the capes. *Young Broadcasting* at ¶ 13. The two men, whose act involved manipulating and stretching their genitalia to simulate various objects, performed a demonstration of their act with the agreement of the show's hosts and at the urging of off-camera station personnel. *Id*. Although the performance was directed away from the camera, the penis of one performer was fully exposed on camera for less than one second as the men turned away to act out their performance. *See id*. at ¶¶ 12, 13. Based on these facts, the Commission found the station apparently liable for a forfeiture penalty for broadcasting indecent material. *Id*. at ¶ 16.

41

The FCC contends *Young Broadcasting* was not a departure from its prior indecency regime. Rather, as it explains, *Young Broadcasting* merely represented the first instance in which the Commission expressly articulated its pre-existing (but unstated) policy of treating fleeting images differently from fleeting words.[16] On this view, according to the FCC, *Young Broadcasting* should have dispelled any doubts about the historical breadth of its fleeting material policy prior to the Halftime Show because it was issued a few days before CBS's broadcast. But *Young Broadcasting* is unavailing for this purpose. It makes no distinction, express or implied, between words and images in reaching its indecency determination. To

[16]Several statements in the FCC's own press release announcing the *Young Broadcasting* Notice of Apparent Liability belie the agency's contention here that *Young Broadcasting* accorded with its prior policies. *See* Press Release, FCC, *Comm'n Proposes to Fine Young Broadcasting of San Francisco, Inc., Statutory Maximum for Apparent Violation of Indecency Rules* (Jan. 27, 2004) (statement of Chairman Michael K. Powell: "Today, we open another front in our increased efforts to curb indecency on our nation's airwaves . . . ."); *id*. (statement of Commissioner Michael J. Copps: "I am pleased that this Commission is finally taking an initial step against indecency on television."); *id*. (statement of Commissioner Kevin J. Martin: "I hope that this step today represents the beginning of a commitment to consider each indecency complaint seriously . . . .").

42

the contrary, it discusses and compares several other FCC determinations on potentially indecent utterances and depictions, treating the cases interchangeably and ultimately distinguishing those cases' outcomes without any indication that the format of the offending material was a relevant consideration. *See, e.g.*, *id*. at ¶ 12 & n.35; *id*. at ¶ 14.[17]

---

[17]One of the cases the FCC distinguished in *Young Broadcasting* was its Notice of Apparent Liability in *Flambo Broadcasting, Inc. (KFMH-FM)*, 9 F.C.C.R. 1681 (MMB 1994), which involved "a radio station's broadcast of sexual material in a crude joke" that was not found actionably indecent. *Young Broadcasting* at ¶ 12 n.35. As with the other cases it discussed in its *Young Broadcasting* Notice of Apparent Liability, the FCC did not draw any distinction between *Young Broadcasting* and *Flambo Broadcasting* based on the subject material there being words or images. But it did distinguish the two notices of apparent liability in part because: "assuming that the joke [at issue in *Flambo Broadcasting*] was cut off immediately, the staff of the then-Mass Media Bureau found that it would not have been actionably indecent because it was *brief, live, unscripted and from an outside source*." *Young Broadcasting* at ¶ 12 n.35 (emphasis added). Notably, the facts here – a brief image of a bare female breast during the live Halftime Show broadcast resulting from an unscripted stunt by Jackson and Timberlake – are remarkably similar to the *Flambo Broadcasting* fact pattern that the FCC found readily distinguishable from the actionably indecent material in *Young*

43

Accordingly, *Young Broadcasting* does not support the FCC's assertion here that its policy on fleeting material had always excluded images and applied only to words. *Young Broadcasting* appears instead to be best understood as the Commission's initial effort to abandon its restrained enforcement policy on fleeting material. While the final disposition of *Young Broadcasting* was still unresolved,[18] the

_____

*Broadcasting*.

[18] *Young Broadcasting* was a notice of apparent liability, which is non-final until the implicated licensee either declines to dispute the findings in the notice or the licensee's responsive opposition is fully adjudicated. *See* FCC Br. at 13 (describing content of CBS Notice of Apparent Liability as "tentative conclusions")*; see also* 47 U.S.C. § 504(c) ("In any case where the Commission issues a notice of apparent liability looking toward the imposition of a forfeiture under this chapter, that fact shall not be used, in any other proceeding before the Commission, to the prejudice of the person to whom such notice was issued, unless (i) the forfeiture has been paid, or (ii) a court of competent jurisdiction has ordered payment of such forfeiture, and such order has become final."). At the time the Commission issued its *Reconsideration Order* against CBS and after its determination in *Golden Globes*, the question of whether the broadcast licensee in *Young Broadcasting* would contest the Notice of Apparent Liability in that case was still unresolved. *See Reconsideration Order* at ¶ 6 n. 25 (indicating

44

overarching policy departure that the Commission sought to accomplish there was effectuated by a combination of its *Golden Globes* order and its orders on appeal here.   The Commission's reasoning in *Young Broadcasting* is therefore illuminating here.

In *Young Broadcasting*, the Commission distinguished that case's facts from several of its prior orders.  But in so doing, the Commission overlooked the fact that application of its fleeting material policy had been a determinative factor in those prior orders.   For example, the licensee in *Young Broadcasting* cited for support *L.M. Communications*, 7 F.C.C.R. 1595 (1992), in which the radio broadcast of a single expletive was found not actionably indecent.   *Young Broadcasting* at ¶ 12 n.35.   The FCC found *L.M. Communications* "distinguishable because there was no finding that the material, in context, was pandering, titillating or intended to shock the audience." *Id*.  But *L.M. Communications* made no reference to the pandering, titillating or shocking nature of the subject broadcast material.  Rather, it determined the material was not actionably indecent because the "broadcast contained only a fleeting and isolated utterance which, within the context of live and spontaneous programming, does not warrant a Commission sanction." *L.M. Commc'ns*, 7 F.C.C.R. at 1595.

_____

the status of the *Young Broadcasting* Notice of Apparent Liability as "response pending" at the time of the *Reconsideration Order*'s issuance).

45

The Commission's failure to acknowledge the existence of its prior policy on fleeting material in *Young Broadcasting* is illustrative of its approach here. In *Young Broadcasting*, it read the policy out of existence by substituting new rationales for its prior indecency determinations that had applied the policy. Here, the Commission is foreclosed from adopting the same approach by its admission in *Golden Globes* that the fleeting material policy existed. So it instead apparently seeks to revise the scope of the policy by contending the policy never included fleeting images. But extensive precedent over thirty years of indecency enforcement demonstrates otherwise.

Our reluctant conclusion that the FCC has advanced strained arguments to avoid the implications of its own fleeting indecency policy was echoed by our sister circuit in *Fox*:

> In [its *Omnibus Order*], the FCC "reject[s] Fox's suggestion that Nicole Richie's [use of two expletives] would not have been actionably indecent prior to our *Golden Globes* decision," and would only concede that it was "not apparent" that Cher's [use of one expletive] at the 2002 Billboard Music Awards would have been actionably indecent at the time it was broadcast. [*Id*.] at ¶¶ 22, 60. Decisions expressly overruled in *Golden Globes* were now dismissed as "staff letters and dicta," and the Commission even implied that the issue of fleeting expletives was one of first impression for the FCC in *Golden*

46

*Globes*. *Id*. at ¶ 21 ("[I]n 2004, the Commission itself considered for the first time in an enforcement action whether a single use of an expletive could be considered indecent.").

*Fox*, 489 F.3d at 456 n.6. When confronted with these troublesome revisionist arguments, the FCC conceded the existence of its prior policy. *See id*. at 456 ("[I]n its brief to this court, the FCC now concedes that *Golden Globes* changed the landscape with regard to fleeting expletives." (citations omitted)); *see also id*. at 470 (Leval, J., dissenting) ("[The FCC] made clear acknowledgment that its *Golden Globes* and *Remand Order* rulings were not consistent with its prior standard regarding lack of repetition."). But it has made no such concession here. Faced with extensive evidence to the contrary, the Commission nevertheless continues to assert that its fleeting material policy was limited to words and did not exclude fleeting images from the scope of actionable indecency.

In sum, the balance of the evidence weighs heavily against the FCC's contention that its restrained enforcement policy for fleeting material extended only to fleeting words and not to fleeting images. As detailed, the Commission's entire regulatory scheme treated broadcasted images and words interchangeably for purposes of determining indecency. Therefore, it follows that the Commission's exception for fleeting material under that regulatory scheme likewise treated images and words alike. Three decades of FCC action support this conclusion. Accordingly, we find the FCC's conclusion on

47

this issue, even as an interpretation of its own policies and precedent, "counter to the evidence before the agency" and "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

Because the Commission fails to acknowledge that it has changed its policy on fleeting material, it is unable to comply with the requirement under *State Farm* that an agency supply a reasoned explanation for its departure from prior policy.[19] *See id.*; *cf. Ramaprakash*, 346 F.3d at 1125 ("[F]ailure to come to grips with conflicting precedent constitutes an [agency's] inexcusable departure from the essential requirement of reasoned decision making."); *LeMoyne-Owen College v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) (Roberts, J.) ("[W]here, as here, a party makes a significant showing that analogous cases have been decided differently, the agency must do more than simply ignore that argument. . . . The need for an explanation is particularly acute when an agency is applying a multi-factor test

---

[19]In its brief and at oral argument, the Commission continues to assert it has not changed its policy on fleeting material, yet it also suggests several reasons why a policy including fleeting images within the scope of actionable indecency is reasonable. *But see State Farm*, 463 U.S. at 50 ("[T]he courts may not accept appellate counsel's post hoc rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." (internal citations omitted)).

48

through case-by-case adjudication."). Consequentially, the FCC's new policy of including fleeting images within the scope of actionable indecency is arbitrary and capricious under *State Farm* and the Administrative Procedure Act, and therefore invalid as applied to CBS.

## IV.

The FCC's arbitrary and capricious change of policy on the broadcast of fleeting indecent material should be a sufficient ground to decide this case. But if not, it would appear the Commission incorrectly determined CBS's liability for Jackson and Timberlake's Halftime Show performance.[20] CBS contends it neither planned Jackson and Timberlake's offensive actions nor knew of the performers' intent to incorporate those actions into their performance. The FCC does not dispute this assertion, but it nevertheless seeks to hold CBS liable for the performers' actions. The Commission offers three theories of liability. First, the FCC contends the performers' intent can be imputed to CBS under the common law doctrine of *respondeat superior*. Second, the FCC contends CBS's unique duties as a broadcast licensee permit an extension of vicarious liability beyond the traditional employer-employee scope of *respondeat superior*. Third, the FCC contends CBS is directly liable for the performers' actions because it "willfully" failed to take adequate measures to guard against a known risk that indecency might occur during the Halftime Show.

---

[20]This issue was extensively briefed by the parties and amici.

49

At this juncture, we do not believe these theories provide grounds for CBS's liability. Jackson and Timberlake were independent contractors, who are outside the scope of *respondeat superior*, rather than employees as the FCC found. The First Amendment precludes the FCC from sanctioning CBS for the indecent expressive conduct of its independent contractors without offering proof of scienter as an element of liability. And it is unclear whether the FCC correctly applied a "willfulness" standard to find CBS liable for failing to prevent the Halftime Show's indecency.

**A.**

The FCC relies primarily on the traditional agency doctrine of *respondeat superior* to hold CBS vicariously liable for the actions of Janet Jackson and Justin Timberlake during the Halftime Show. The *respondeat superior* doctrine provides that "[a]n employer is subject to liability for torts committed by employees while acting within the scope of their employment." Restatement (Third) of Agency § 2.04 (2006); *see also id*. § 7.07. The doctrine's "scope is limited to the employment relationship and to conduct falling within the scope of that relationship . . . ." *Id*. § 2.04 cmt. b. Here, the parties dispute whether the conduct giving rise to liability was performed by CBS's employees. CBS asserts, and the FCC denies, that Jackson and Timberlake were independent contractors and therefore outside the scope of *respondeat superior*. CBS also contends *respondeat superior* is an unsuitable theory of liability

50

in the broadcast indecency context and asserts the FCC's "novel" adoption of it in this case is improper.

The federal statutes restricting broadcast indecency, 18 U.S.C. § 1464, and establishing the FCC's forfeiture penalty scheme, 47 U.S.C. § 503, are silent on vicarious liability. Nevertheless, there is sound authority that CBS may be vicariously liable for the indecent speech or expression of its employees. *See Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 253-54 (1974) (holding a newspaper publisher "liable under traditional doctrines of respondeat superior" for a reporter's story that contained knowing falsehoods injurious to the privacy of the subjects of the story); *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1089 n.34 (3d Cir. 1988) ("Because [reporter] Sandy Smith was an employee of Time, Time is responsible for Smith's actual malice under a theory of respondeat superior." (citing *Cantrell*, 419 U.S. at 253-54; R. Smolla, Law of Defamation § 3.36 (1986))). Accordingly, if a broadcaster's employee violates the indecency provision of 18 U.S.C. § 1464, as sanctioned through the forfeiture scheme of 47 U.S.C. § 503(b), *respondeat superior* liability may be permissible.

But even though the *respondeat superior* doctrine may apply in this context, it is limited to the conduct of employees acting within the scope of their employment. Determining whether CBS may be liable under *respondeat superior* first requires selection of the applicable legal standard for differentiating an "employee" from an "independent contractor." Neither party has adequately analyzed the issue. CBS suggests

51

New York law applies, asserting the FCC itself determined in its orders that a choice-of-law provision included in both performers' Halftime Show agreements requires application of New York law. But it provides no additional argument in support of applying New York law. The Commission denies it ever made this determination in its orders, instead urging application of "federal law," but without elaborating or specifying the applicable legal standard.

As CBS states, the Commission, in its orders in this case, referenced the choice-of-law provisions in the Jackson and Timberlake performance agreements. *See Forfeiture Order* at ¶ 25 n.88; *Reconsideration Order* at ¶ 27 n.90. But those references by the Commission, read in context, were not determinations of what law should apply here. Rather, as it asserts, the FCC cited New York law as one non-exhaustive example of "courts applying common law agency principles." *Reconsideration Order* at ¶ 27. And its references to the choice-of-law provisions in the performers' agreements were included only for the purpose of adding weight to its citations to New York law in this regard.

Moreover, the choice-of-law provisions in the Jackson and Timberlake performance agreements only select New York contract law. The provisions, which are identical in the two agreements, read: "CHOICE OF LAW: This Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of New York applicable to contracts executed and to be performed entirely therein." The plain text of these

contract provisions select "the laws of the State of New York applicable to contracts" – that is, New York contract law – in all disputes central or collateral to the contract. *Respondeat superior* is a principle of agency law. Were the present case a matter of interpreting the construction or validity of contractual provisions, New York law might well apply. But we read the contract as silent on applicable agency law, and CBS has not offered any further explanation to support a finding to the contrary.

Furthermore, even if the choice-of-law provisions had been inclusively drafted to select all categories of New York law, or if the "matters or issues collateral thereto" language of the choice-of-law provisions could be interpreted to cover this case, our conclusion would be the same. The regulation of broadcast indecency is the province of the federal government.[21]

---

[21]The FCC possesses broad authority to regulate television broadcasters, which operate as licensees subject to federal rules. Some of those rules, such as the indecency restrictions implicated here, appear to leave little room for regulation by the States. *See Allen B. Dumont Labs. v. Carroll*, 184 F.2d 153, 156 (3d Cir. 1950) (invalidating a regulation of the Pennsylvania State Board of Censors, which required that all motion picture films intended to be broadcast by television in Pennsylvania be submitted to the Board for censorship purposes, because federal provisions on broadcast indecency, profanity and obscenity preempted state censorship rules).

53

Whether or not an agent was an "employee" of its principal – for the specific purpose of determining liability under the broadcast indecency regime – depends on the definition the federal government assigns to the term "employee" under its administrative scheme. No state's law may alter the scope or nature of liability for broadcast indecency by supplying an alternate definition.

Accordingly, we believe the FCC's contention that "federal law" applies is correct. Liability here arises under a federal regulatory scheme, and defining the boundaries of permissible vicarious liability under that scheme is likewise a federal matter. To hold otherwise would create opportunities for broadcasters to evade liability for broadcast indecency through artful drafting of contracts and would frustrate the federal government's intention of crafting uniform national rules restricting the transmission of indecent and obscene material over public airwaves. *Cf. Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989) ("Establishment of a federal rule of agency, rather than reliance on state agency law, is particularly appropriate here given the [Copyright Act of 1976]'s express objective of creating national, uniform copyright law by broadly pre-empting state statutory and common-law copyright regulation."). The question is how to define the scope and substance of the vicarious liability rule here – a uniform federal rule on a broadcaster's liability for its own agents' indecent acts.

54

In analogous situations requiring a determination of vicarious liability under a uniform, nationally-applicable law, the Supreme Court has looked to the general common law of agency rather than the law of any particular state:

> The Act nowhere defines the terms "employee" or "scope of employment." It is, however, well established that where Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms. In the past, when Congress has used the term "employee" without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine. . . . [W]hen we have concluded that Congress intended such terms as "employee," "employer," and "scope of employment" to be understood in light of agency law, we have relied on the general common law of agency, rather than on the law of any particular State, to give meaning to these terms.

*Reid*, 490 U.S. at 739-40 (interpreting use of the term "employee" in the Copyright Act of 1976, to ascertain whether a work was prepared by an employee or independent contractor, which is part of the determination of whether work is "for hire"

55

under the Act) (internal quotations and citations omitted); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 n.3 (1992) ("As in *Reid*, we construe the term ['employee' in ERISA, 29 U.S.C. § 1002(6),] to incorporate 'the general common law of agency, rather than . . . the law of any particular State." (quoting *Reid*, 490 U.S. at 740)). Unlike in *Reid* or *Darden*, here we do not review a statutory scheme in which Congress expressly used the terminology of agency law. The relevant provisions of 18 U.S.C. § 1464 and 47 U.S.C. § 503(b) do not include terms such as "employee" or "scope of employment." But the *respondeat superior* doctrine's application in the broadcast indecency context is premised on the notion that some form of vicarious liability under these statutes was implicitly authorized by Congress.

Drawing on *Reid* and *Darden* for guidance, we agree with the FCC that the general common law of agency supplies the appropriate standard for determining whether Jackson and Timberlake were employees of CBS where Congress has not provided specific direction on the scope of vicarious liability in this context. In *Darden*, the Court described *Reid* as requiring a "presumption that Congress means an agency law definition for 'employee' unless it clearly indicates otherwise . . . ." *Darden*, 503 U.S. at 325 (citations omitted). The Court's rationale is based on Congress's creation of vicarious liability without defining the scope of that liability – not whether magic words have been included in the statute:

56

ERISA's nominal definition of "employee" as "any individual employed by an employer," 29 U.S.C. § 1002(6), is completely circular and explains nothing. As for the rest of the Act, Darden does not cite, and we do not find, any provision either giving specific guidance on the term's meaning or suggesting that construing it to incorporate traditional agency law principles would thwart the congressional design or lead to absurd results. Thus, we adopt a common-law test for determining who qualifies as an "employee" under ERISA, a test we most recently summarized in *Reid* . . . .

*Id*. at 323 (footnote omitted). The *Darden* rationale applies with equal force here. Assuming Congress authorized vicarious liability at all under 18 U.S.C. § 1464 and 47 U.S.C. § 503(b), its implicit authorization by definition lacks specificity. There is little difference between implicit adoption of a rule and the explicit but "circular" and uninformative inclusion of agency law terminology in statutory text.

Moreover, the Court in *Reid* explained that the practice of relying on the general common law of agency, rather than the law of any particular state, "reflects the fact that 'federal statutes are generally intended to have uniform nationwide application.'" *Id*. at 740 (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989)). CBS has not offered any reason why this rule should not inform our interpretation of the federal

57

government's regulatory scheme for broadcast indecency.[22]

---

[22]The Supreme Court has noted the breadth and uniformity of the FCC's federal regulatory regime for the broadcast industry:

> The Commission's authority to regulate broadcasting and other communications is derived from the Communications Act of 1934, as amended. The Act's provisions are explicitly applicable to "all interstate and foreign communication by wire or radio . . . ." 47 U.S.C. § 152(a). The Commission's responsibilities are no more narrow: it is required to endeavor to "make available . . . to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service . . . ." 47 U.S.C. § 151. The Commission was expected to serve as the "single Government agency" with "unified jurisdiction" and "regulatory power over all forms of electrical communication, whether by telephone, telegraph, cable, or radio." It was for this purpose given "broad authority." As this Court emphasized in an earlier case, the Act's terms, purposes, and history all indicate that Congress "formulated a unified and comprehensive regulatory system for the (broadcasting) industry." *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 137 (1940).

*United States v. Sw. Cable Co.*, 392 U.S. 157, 167-68 (1968)

Accordingly, we agree with the FCC that *respondeat superior* liability for violations of 18 U.S.C. § 1464, as sanctioned through 47 U.S.C. § 503(b) forfeiture penalties, "should be understood in light of the general common law of agency," *Reid*, 490 U.S. at 741. And under the common law, *respondeat superior* is limited to the employer-employee relationship.

In *Reid*, the Court set forth a test, incorporating the Restatement definition of "employee," for determining who qualifies as an "employee" under the common law:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring

(footnotes omitted).

59

party; whether the hiring party is in business; and the tax treatment of the hired party.

*Id*. at 751-52 (internal quotations and citations omitted).

While establishing that all of these factors are relevant and that "no one of these factors is determinative," *id*. at 752, *Reid* did not provide guidance on the relative weight each factor should be assigned when performing a balancing analysis. But the Court has indicated that determining the appropriate balance is a case-specific endeavor:

> There are innumerable situations which arise in the common law where it is difficult to say whether a particular individual is an employee or an independent contractor . . . . In such a situation . . . there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. What is important is that the total factual context is assessed in light of the pertinent common-law agency principles.

*NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 258 (1968) (footnote omitted). Other courts have followed this approach. *See*, *e.g.*, *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 85 (2d Cir. 1995) ("[T]he [*Reid*] factors are weighed by referring to the facts of a given case." (citing *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992))).

Accordingly, all of the *Reid* factors are relevant, and no one factor is decisive, but the weight each factor should be accorded depends on the context of the case. Some factors will have "little or no significance in determining whether a party is an independent contractor or an employee" on the facts of a particular case. *Aymes*, 980 F.2d at 861; *see Marco v. Accent Publ'g Co.*, 969 F.2d 1547, 1552 (3d Cir. 1992) (noting that three *Reid* factors were "indeterminate" on the facts of the case and according those factors little or no weight in applying *Reid*'s balancing test).[23]

---

[23]In *Aymes*, the Second Circuit offered an example of how the facts of a case might diminish the significance of a *Reid* factor:

> The [*Reid*] factors should not merely be tallied but should be weighed according to their significance in the case.
>
> For example, the factors relating to the authority to hire assistants will not normally be relevant if the very nature of the work requires the hired party to work alone. In such a case, that factor should be accorded no weight in applying the *Reid* test. Having the authority to hire assistants, however, might have great probative value where the individual claiming to be an independent contractor does exercise authority to enlist assistants without prior approval of the party that hired him. In the latter case, this show

61

In the present case, the FCC erred by failing to consider several important *Reid* factors when determining whether Jackson and Timberlake were employees of CBS. And rather than balancing those factors it did consider, the Commission focused almost exclusively on CBS's right of control over the performers. *See* FCC Br. at 42 ("The critical factor of control weighs so heavily in favor of a conclusion that Jackson and Timberlake were CBS's employees that, as the Commission reasonably determined, consideration of that factor alone is

> of authority would be highly indicative that the hired party was acting as an independent contractor.

*Aymes*, 980 F.2d at 861. The court went on to specify five *Reid* factors that "will be significant in virtually every situation" and "should be given more weight in the analysis, because they will usually be highly probative of the true nature of the employment relationship." *Id*. These factors, according to the court, include: "(1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party." *Id*. We agree that these factors will almost always be critical in determining whether a hired party is an employee or independent contractor. But we reiterate that the proper weight to be accorded any *Reid* factor is dependent on its significance in the relevant case.

62

'decisive.'" (citing *Reconsideration Order* at ¶ 27)).[24] Although the right-to-control factor is usually significant in determining employment status, the Commission assigned it disproportionate, even dispositive, weight here. But *Reid* stresses contextual balancing, with no one factor decisive. *See Marco*, 969 F.2d at 1552 (rejecting an application of the *Reid*

---

[24]In its *Reconsideration Order*, the Commission explained that "every aspect of the performance, including the exact time, length, location, material, set, script, staging, and wardrobe, was subject to the control of Viacom/CBS through its corporate affiliate MTV." *Id.* at ¶ 26. The Commission went on to state:

> We recognize that some of the common law factors are not indicative of agency. Again, however, the relative weight of common law factors varies according to the legal context in which the agency issue arises. The central issue here is the parties' relationship for the specific purpose of imposing vicarious liability for the performers' actions in [the Halftime Show] performance that were harmful to the public (rather than for copyright, workers' compensation, anti-discrimination or other purposes). In this context, the Commission properly concluded that the evidence clearly demonstrating Viacom/CBS's right to control the halftime show performance was decisive.

*Id.* at ¶ 27 (footnote omitted).

63

test that gave "disproportionate consideration" to the factor of control, reiterating that no single factor is dispositive of employee status, and instructing that "courts should keep this factor [of control] in perspective"). Accordingly, we will review the *Reid* factors, weighed in light of the context of this case, to determine whether Jackson and Timberlake were employees or independent contractors of CBS.[25]

[25]On appellate review, the findings of fact constituting each relevant *Reid* factor are afforded significant deference under the Administrative Procedure Act ("APA"). But balancing those factors to determine employment status is a question of law traditionally accorded no deference. *See Marco*, 969 F.2d at 1548 ("[W]e exercise plenary review of the . . . application of the law of agency to the facts." (citations omitted)); *Carter*, 71 F.3d at 85-87 (describing the question of whether a hired party is an employee or independent contractor as a "legal conclusion" and engaging in de novo balancing of the *Reid* factors); *Aymes*, 980 F.2d at 861-64 (same).

In the past, we have held that agency determinations on questions of law not within the agency's expertise – such as the FCC's determination here on employment status – receive less deference under the APA than other agency conclusions. *See Nat'l Indus. Sand Ass'n v. Marshall*, 601 F.2d 689, 699 n.34 (3d Cir. 1979) ("A court may decide all relevant questions of law [d]e novo under the standard set forth in 5 U.S.C. [§] 706(2)(A)." (citation omitted)). Other courts have agreed. *See, e.g.*, *Wolfe v. Barnhart*, 446 F.3d 1096, 1100 (10th Cir. 2006)

("When we review an agency's decision under the APA's arbitrary, capricious or abuse of discretion standard, our review is narrow and deferential . . . . However, these limitations do not apply to questions of law." (citations and internal quotation omitted)); *Davidson v. Glickman*, 169 F.3d 996, 1000 (5th Cir. 1999) ("Under the APA, we review questions of law de novo, without deference to the agency's conclusions." (citations omitted)); *Wagner v. Nat'l Transp. Safety Bd.*, 86 F.3d 928, 930 (9th Cir. 1996) ("Purely legal questions are reviewed *de novo*." (citation omitted)); *Texas E. Prods. Pipeline Co. v. Occupational Safety and Health Review Comm'n*, 827 F.2d 46, 47 (7th Cir. 1987) ("For questions of law, the APA on its face mandates de novo review." (citing the text of 5 U.S.C. § 706: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law . . . .") (additional citation omitted)); *Artesian Indus., Inc. v. Dep't of Health and Human Servs.*, 646 F.Supp. 1004, 1006 (D.D.C. 1986) ("Based on the express language of the APA, the arbitrary and capricious standard applies only to 'actions, findings and conclusions,' by an agency, excluding any questions of law. The APA explicitly empowers reviewing courts to decide 'all relevant questions of law,' and the United States Court of Appeals for the District of Columbia Circuit has construed this language to mean what it says–questions of law are to be decided by courts, not agencies." (citations and footnotes omitted)).

65

Only three factors weigh in favor of a determination that Jackson and Timberlake were employees of CBS. First, CBS is in business, which "increases the possibility that it would employ people." *Marco*, 969 F.2d at 1551. Second, CBS regularly produces shows for national broadcast in the course of its business. Both factors are relatively insignificant on balance.

---

Here, we need not resolve whether de novo review of the FCC's application of the *Reid* test is appropriate. It is true the FCC has no unique expertise in determining whether a broadcast licensee's agent is an employee or independent contractor under the general common law of agency. But even under the APA's traditionally deferential standard, we "hold unlawful and set aside" agency conclusions that are "not in accordance with law." 5 U.S.C. § 706(2)(A). And the FCC's conclusion on the performers' employment status, by placing dispositive weight on the single factor of CBS's right to control, is contrary to settled law under *Reid*. *See Marco*, 969 F.2d at 1552 (rejecting an application of the *Reid* test that gave "disproportionate consideration" to the factor of control, reiterating that no single factor is dispositive of employee status, and instructing that "courts should keep this factor [of control] in perspective"). Moreover, the FCC failed to consider several relevant *Reid* factors – an error the Supreme Court has described as sufficient to render an agency's conclusions "arbitrary and capricious" under the APA. *See State Farm*, 463 U.S. at 43 (describing an agency's "fail[ure] to consider an important aspect of [a] problem" as "arbitrary and capricious" under the APA).

66

*See id.* (noting that a hiring party might "easily accomplish its regular business by using independent contractors rather than employees"); *Aymes*, 980 F.2d at 863 (according factor of whether hiring party is in business "negligible" weight, noting it "will always have very little weight in this analysis" and "will generally be of little help").

Third, and most significant to its argument, is the factor the FCC focused on in its orders: CBS's right to control the manner and means by which Jackson and Timberlake accomplished their Halftime Show performance. As the FCC contends, CBS, through its corporate affiliates, supervised the Halftime Show and retained the right to approve all aspects of the show's performances. But it is undisputed that CBS's actual control over the Halftime Show performances did not extend to all aspects of the performers' work. The performers, not CBS, provided their own choreography and retained substantial latitude to develop the visual performances that would accompany their songs. Similarly, as the FCC notes, CBS personnel reviewed the performers' selections of set items and wardrobes, but the performers retained discretion to make those choices in the first instance and provided some of their own materials.[26]

---

[26]Furthermore, the FCC, asserting that CBS "scripted every word uttered on stage," appears to overstate CBS's scripting role. The record indicates the performers – and Jackson in particular – had a role in selecting songs to be performed at the

67

We reviewed a comparable set of facts in *Marco*, where we held a photographer was an independent contractor even though the hiring party, a magazine, exercised significant "control over the details of the work." *Marco*, 969 F.2d at 1551. There, the magazine "supplied jewelry, props, models, sketches intended to describe the exact composition of the photographs, and, at some sessions, an Art Director." *Id*. Even though the magazine "controlled . . . the subject matter and composition of the images," we noted that other aspects of the work – "including the choice of light sources, filters, lenses, camera, perspective, aperture setting, shutter speed, and processing techniques" – were not under the magazine's control. *Id*. at 1551-52. Moreover, the Art Director – although exercising supervisory control – only supervised "some" of the sessions, and his "supervision was limited to subject matter, composition, and 'mood.'" *Id*. at 1552.

Here, as in *Marco*, CBS's control was extensive but not determinative of employment. Even though a principal's right to control is an important factor weighing in favor of a determination that an employment relationship existed, it is not dispositive when considered on balance with the rest of the *Reid*

show, all of which were previously recorded by the performers. Moreover, the songs were revised by the performers and their assistants to accommodate extra vocalists, time constraints, and other unique aspects of the Halftime Show performances.

68

factors. Of the remaining factors significant on the facts here,[27] all are strongly indicative of Jackson and Timberlake's independent contractor status. First, it is undisputed that both Jackson and Timberlake were hired for brief, one-time performances during the Halftime Show; CBS could not assign more work to the performers.[28] Second, Jackson and

---

[27]Some *Reid* factors carry little or no weight in our analysis because they are indeterminate on the facts. *See Marco*, 969 F.2d at 1552 (finding some factors indeterminate based on the facts of that case). The extent of the performers' "discretion over when and how long to work" is unclear. Their performance agreements require certain scheduled appearances and rehearsals, including the Halftime Show itself, but the record indicates the performers were free to (and did) complete additional preparations at their own discretion. Similarly, the record is inconclusive on the location of the performers' work – some of which was on set and scheduled, and some of which was off set and unscheduled.

[28]This factor is accorded great weight under the common law:

> In general, employment contemplates a continuing relationship and a continuing set of duties that the employer and employee owe to each other. Agents who are retained as the need arises and who are not otherwise employees of their principal normally operate their own business enterprises and are not, except in limited

Timberlake selected and hired their own choreographers, backup dancers, and other assistants without any involvement on the part of CBS. Third, Jackson and Timberlake were compensated by one-time, lump-sum contractual payments and "promotional considerations" rather than by salaries or other similar forms of remittances, without the provision of employee benefits. Fourth, the skill required of a performer hired to sing and dance as the headlining act for the Halftime Show – a performance during a Super Bowl broadcast, as the FCC notes, that attracted nearly 90 million viewers and was the highest-rated show during the 2003-04 television season – is substantial even relative to the job of a general entertainer, which is itself a skilled occupation.

Also weighing heavily in favor of Jackson and Timberlake's status as independent contractors is CBS's assertion in its briefs, which the FCC does not refute, that it paid no employment tax. Had the performers been employees rather

respects, integrated into the principal's enterprise so that a task may be completed or a specified objective accomplished. Therefore, respondeat superior does not apply.

Restatement (Third) of Agency § 2.04 cmt. b (2006); *see also Aymes*, 980 F.2d at 861 (describing the hiring party's right to assign additional work as one of five *Reid* factors, along with control, to be "given more weight in the analysis, because [it] will usually be highly probative of the true nature of the employment relationship").

than independent contractors, federal law would have required CBS to pay such taxes. *See*, *e.g.*, *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 3 (1962) (citing statutory provisions requiring employers to pay Social Security taxes of their employees); *McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 721 (11th Cir. 2002) (explaining the FICA tax scheme, which requires employers to share the FICA tax liabilities of their employees but not of their independent contractors).

Finally, there is no evidence that Jackson, Timberlake, or CBS considered their contractual relationships to be those of employer-employee. In *Reid*, the Court incorporated the Restatement, describing it as "setting forth a nonexhaustive list of factors relevant to determining whether a hired party is an employee" under the common law of agency. 490 U.S. at 752. Among the factors not explicitly listed in *Reid,* but included in the Restatement, is the parties' understanding of their contractual relationship. *See* Restatement (Third) of Agency § 7.07 cmt. f (including as an explicit factor in determining employment status "whether the principal and the agent believe that they are creating an employment relationship"). Although the Commission did not inquire into this factor, it should have been a significant consideration in this case. Under the FCC's rationale, band members contracted to play a one-song set on a talk show or a "one-show-only" televised concert special presumably would be employees of the broadcaster. These performers – who frequently promote their work through brief

71

contractual relationships with media outlets – would be "employees" of dozens of employers every year. Accordingly, it is doubtful that either the performers here or CBS believed their contracts created employment relationships. Nevertheless, given the lack of a developed record on this factor, we will not accord it significant weight in our analysis.

On balance, the relevant factors here weigh heavily in favor of a determination that Jackson and Timberlake were independent contractors rather than employees of CBS. The Commission erred in according the right-to-control factor disproportionate weight and in treating it as determinative without considering several significant factors weighing against it. *Cf. Reid*, 490 U.S. at 752 ("Examining the circumstances of this case in light of these factors, we agree . . . that Reid was not an employee of CCNV but an independent contractor. True, CCNV members directed enough of Reid's work to ensure that he produced a sculpture that met their specifications. But the extent of control the hiring party exercises over the details of the product is not dispositive. Indeed, all the other circumstances weigh heavily against finding an employment relationship."). In sum, both performers were acting as independent contractors for the limited purpose of providing entertainment services for one isolated, brief program. Accordingly, the doctrine of *respondeat superior* does not apply on these facts.

72

**B.**

Although vicarious liability is traditionally limited to the employer-employee scope of *respondeat superior*, the FCC proffers an alternative theory of liability under which CBS may be held vicariously liable for its independent contractors' actions based on its duties as a broadcast licensee. The FCC contends CBS is vicariously liable for Jackson and Timberlake's actions during the Halftime Show – irrespective of their status as independent contractors – because broadcast licensees hold non-delegable duties to avoid the broadcast of indecent material and to operate in the public interest. CBS disputes the validity of this theory as applied to them, contending it functionally creates a strict liability standard for broadcast indecency and therefore unconstitutionally eliminates the scienter element of the indecency provisions of 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999(b).

**1.**

Broadcast licensees hold several duties as conditions of maintaining their licenses. There are good reasons to hold a broadcaster strictly liable for complying with licensing rules. Broadcasters have the right and the capability to control the manner in which they operate and conduct their business as licensees on the public airwaves. It may be argued that anything less than strict liability may relieve broadcasters of responsibility and undermine their willingness to exercise vigilance.

73

In some contexts, these reasons have led the FCC to adopt and enforce strict liability for broadcasters' violations of its rules and regulations. The Commission has cited several of these cases in support of its determination of CBS's liability.[29]

---

[29]*See, e.g., Forfeiture Order* at ¶ 23 n.80 (citing *In re Liab. of Wagenvoord Broad. Co., Licensee of Station WVOG, New Orleans, LA*, 35 F.C.C.2d 361 (1972); *In re Enure Family Ltd. P'ship*, 17 F.C.C.R. 7042, 7044 (FCC Enforcement Bureau 2002)) (additional citations omitted). *Wagenvoord* held a broadcast licensee liable where an independent contractor "consulting engineer negligently provided erroneous advice that resulted in the violations of the station's presunrise authorization." *See Wagenvoord* at ¶ 3. Similarly, *Enure Family Limited Partnership* held a broadcast licensee liable where an independent contractor violated FCC rules by failing to properly monitor the beacon light on an antenna structure and notify the licensee of an outage. *See Enure Family Ltd. P'ship* at ¶ 7. Other FCC cases on point are likewise directed towards broadcast licensees' delegation of technical and operational duties. *See, e.g., In re Application for Review of Liab. of MTD, Inc., Permittee of Station KWMW(FM), Maljamar, NM*, 6 F.C.C.R. 34, ¶ 5 (1991) (holding licensee liable for independent contractor's violation of Commission's tower lighting rule); *In re Liab. of Sundial Broad. Corp., Licensee of Station KDFC(FM), San Francisco, CA*, 30 F.C.C.2d 949 (1971) (holding licensee liable for an independent contractor engineer's failure to make equipment performance measurements within

But unlike the facts in this case, all of the cases cited by the FCC address situations in which a third party steps into the shoes of a broadcaster, performing the broadcaster's duties by operating stations, maintaining equipment, or otherwise filling the broadcaster's role as a licensee. Essentially, these cases prohibit licensees from avoiding liability by delegating aspects of the operation and control of broadcasting facilities or equipment to third-party independent contractors.

But the Commission has cited no authority for the proposition that a broadcaster may be vicariously liable for the speech or expression of its independent contractors.[30] Cases

---

the time period required by the Commission).

[30]*Cantrell* is inapposite for this purpose. Central to the Court's holding in *Cantrell* was the status of the reporter as an employee acting within the scope of his employment. *See Cantrell*, 419 U.S. at 253 ("[There] was sufficient evidence for the jury to find that Eszterhas' writing of the feature was within the scope of his employment at the Plain Dealer and that Forest City Publishing Co. was therefore liable under traditional doctrines of respondeat superior." (footnote omitted)); *see also McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1302 (D.C. Cir. 1996) ("The writer in question [in *Cantrell*] was an employee of the corporate defendant, and, although the trial court had given an instruction somewhat muddling the categories of employee and agent, no one had objected. So *Cantrell* presented no

75

concerning the operation or maintenance of broadcasting stations are inapposite to a determination of the scope of a licensee's liability for the content of its programming. A broadcast licensee's relationships with the performers it hires to create the content of its broadcasts are as a factual matter significantly different than those in which a third party steps into the licensee's shoes to perform requisite maintenance on broadcast equipment or similar operational duties. Moreover, the nature of a licensee's duty with respect to broadcast content implicates different legal considerations than do its duties with respect to the operation of its stations or equipment. Unlike the Commission's prior cases on the operational and managerial aspects of broadcasting, the imposition of liability for the content of programming necessarily implicates the First Amendment. For example, an unwitting broadcaster might be held liable for its independent contractor's negligence in monitoring and maintaining a tower antenna without raising a constitutional question. But the same cannot be said of imposing liability for the speech or expression of independent contractors. *Cf. McFarlane*, 74 F.3d at 1303 ("[A]ctual malice is a First Amendment protection predicated on a subjective state of mind, which surely cuts against any extension of vicarious liability beyond *respondeat superior*. . . . [W]e doubt that actual malice can be imputed except under *respondeat superior* . . . .").

---

occasion for the Court to address the issue of when the mental state of non-employee agents may be imputed to the principal." (citations omitted)).

76

**2.**

Broadcast licensees' duties with respect to the content of broadcast material are defined by statute under 18 U.S.C. § 1464 and by the corresponding agency rule, 47 C.F.R. § 73.3999(b). The Commission correctly asserts that a licensee may not sidestep its obligations under these provisions, including the licensee's duty to avoid the broadcast of indecent material, through routine delegation to third parties. And the Commission's practical concerns underscoring the need for strict liability are meritorious. But because these provisions sanction the content of speech or expression, the First Amendment precludes a strict liability regime for broadcast indecency. The First Amendment requires that the FCC prove scienter when it seeks to hold a broadcaster liable for indecent material. In the case of scripted or pre-recorded indecent material, the scienter element likely would be satisfied. But when the indecent material is unscripted and occurs during a live broadcast, as in the Halftime Show, a showing of scienter must be made on the evidence.

It is a well-established constitutional requirement that in the few areas where the government may lawfully enforce content-based restrictions on speech and expression, liability may not be imposed on a speaker without proof of scienter. *See*, *e.g.*, *In re Grand Jury Matter, Gronowicz*, 764 F.2d 983, 988 (3d Cir. 1985) (en banc) ("In the post-publication [punishment of the dissemination of conscious falsehoods] setting, . . . accomodation to the first amendment protection of free

77

expression is made by scienter requirements . . . .”). Non-obscene child pornography, for instance, can be restricted when adult pornography cannot because the State’s compelling interest in protecting children outweighs conflicting First Amendment interests. *New York v. Ferber*, 458 U.S. 747 (1982); *United States v. Cochran*, 17 F.3d 56, 58 (3d Cir. 1994). But statutes criminalizing child pornography must require proof of scienter to withstand constitutional scrutiny. *Cochran*, 17 F.3d at 58; *see Ferber*, 458 U.S. at 765. Proof of scienter is necessary even where the prohibited category of speech or expression is unprotected by the First Amendment. In *Smith v. California*, 361 U.S. 147 (1959), the Supreme Court set forth a constitutional rule that convictions under statutes prohibiting obscenity cannot be sustained without proof of the defendant’s scienter. As the Court discussed in *Smith*, a contrary rule would risk chilling protected speech. *Id*. at 153-54. The rule announced in *Smith* has been reaffirmed repeatedly by the Court. *See, e.g.*, *Osborne v. Ohio*, 495 U.S. 103, 115 (1990); *Hamling v. United States*, 418 U.S. 87, 123 (1974); *Ginsberg v. New York*, 390 U.S. 629, 644 (1968); *Mishkin v. New York*, 383 U.S. 502, 511 (1966).

The FCC contends its broadcast indecency regime, as a civil enforcement mechanism, is distinguishable from *Smith*, which reviewed convictions under criminal statutes. But the Supreme Court rejected a similar argument in *Manual Enterprises, Inc. v. Day*, 370 U.S. 478 (1962). *See id*. at 492 (“[T]his Court’s ground of decision in *Smith v. California* . . .

78

indicates that a substantial constitutional question would arise were we to construe [a statute proscribing obscene advertising] as not requiring proof of scienter in civil proceedings."); *cf. New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964) ("What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel. The fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute."); *Gronowicz*, 764 F.2d at 988 ("No distinction having any first amendment significance can be made between libel, civil or criminal, and fraud, civil or criminal. In both libel and fraud, post-publication sanctioning occurs because of a falsehood made with the requisite state of mind."). We agree with other courts that "'any statute that chills the exercise of First Amendment rights must contain a knowledge element.'" *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 611 (6th Cir. 2005) (quoting *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992)).

Moreover, indecency is protected by the First Amendment, whereas the constitutional rule of *Smith* applied to obscenity, an unprotected form of speech. If liability for obscenity may lie only where scienter is proven, then liability for higher-value speech must depend on a showing of some quantum of scienter at least as significant. The government's authority to restrict constitutionally protected speech or expression can be no greater than its authority to restrict unprotected speech or expression. *See Florida Star v. B.J.F.*,

491 U.S. 524, 539 (1989) ("Nor is there a scienter requirement of any kind under [Florida Stat.] § 794.03[, which proscribes the dissemination through mass communication of the name of a sexual assault victim's name,] engendering the perverse result that truthful publications challenged pursuant to this cause of action are less protected by the First Amendment than even the least protected defamatory falsehoods . . . .").

Accordingly, the statutory prohibition of broadcast indecency, 18 U.S.C. § 1464, should be read to include a scienter element. Other courts have agreed. In *Tallman v. United States*, 465 F.2d 282 (7th Cir. 1972), the United States Court of Appeals for the Seventh Circuit held scienter is a necessary ingredient of an offense under 18 U.S.C. § 1464. *Id*. at 285. In a companion case, the court described its *Tallman* holding as "conclud[ing] that scienter is a pertinent and necessary element for conviction under [18 U.S.C.] § 1464 . . . ." *United States v. Smith*, 467 F.2d 1126, 1128 (7th Cir. 1972). Similarly in *Gagliardo v. United States*, 366 F.2d 720 (9th Cir. 1966), the United States Court of Appeals for the Ninth Circuit, reviewing a conviction for violating the obscenity provision of 18 U.S.C. § 1464, described the defendant's intent as a "very pertinent and necessary element" for conviction under the statute. *Id*. at 724.

Because it also grounded CBS's forfeiture liability in a violation of the indecency provisions of 47 C.F.R. § 73.3999, the agency's administrative rule on broadcast indecency, the FCC contends the scienter element requisite to 18 U.S.C. § 1464

80

is not necessarily an impediment here. The rule provides that "[n]o licensee of a radio or television broadcast station shall broadcast on any day between 6 a.m. and 10 p.m. any material which is indecent." *Id*. But the title of 47 C.F.R. § 73.3999, "Enforcement of 18 U.S.C. § 1464 (restrictions on the transmission of obscene and indecent material)," seems to indicate that the rule merely enforces 18 U.S.C. § 1464 and does not serve as an independent prohibition on indecency in broadcasting.

The history of Rule 73.3999 further shows that the indecency element of the rule is identical to that of 18 U.S.C. § 1464. In 1988, Congress directed the FCC to "promulgate regulations in accordance with section 1464, title 18, United States Code, to enforce the provisions of such section on a 24 hour per day basis." An Act Making Appropriations for the Departments of Commerce, Justice, and State, Pub. L. No. 100-459, § 608, 102 Stat. 2186, 2228 (1988). On December 28, 1988, the FCC complied by adopting 47 C.F.R. § 73.3999, which provided in its entirety that "[t]he Commission will enforce the provisions of section 1464 of the United States Criminal Code, 18 U.S.C. 1464, on a twenty-four hour per day basis in accordance with Pub. L. No. 100-459." This rule was subsequently invalidated by the United States Court of Appeals for the D.C. Circuit, which rejected a 24-hour ban on indecency and mandated a safe-harbor time period during which 18 U.S.C. § 1464 would not be enforced. *See ACT I*, *supra*, 932 F.2d at 1508. The FCC then amended the rule to include a safe-harbor

period, but subsequent review by the D.C. Circuit sitting en banc found the FCC's safe-harbor time period too limited. The court instructed the FCC to "limit its ban on broadcasting of indecent programs to the period from 6:00 a.m. to 10:00 p.m." *ACT II*, *supra*, 58 F.3d at 670. In response, the FCC amended 47 C.F.R. § 73.3999 to its current form. *In re Prohibitions Against Broad. Indecency in 18 U.S.C. § 1464*, 10 F.C.C.R. 10558 (1995).

Accordingly, the Commission's proffered interpretation of 47 C.F.R. § 73.3999, which appears to contradict the plain language of the regulation as well as the history of its adoption, would appear to be erroneous and inconsistent with the regulation.[31] Because Rule 73.3999 only indicates the time of

---

[31]The FCC's "interpretation of its own regulation is, of course, entitled to considerable deference." *Barnes v. Cohen*, 749 F.2d 1009, 1018 (3d Cir. 1984). But "our deference to an agency's interpretation of its own regulations is 'tempered by our duty to independently insure that the agency's interpretation comports with the language it has adopted.'" *Conn. Gen. Life Ins. Co. v. Comm'r of Internal Revenue*, 177 F.3d 136, 144 (3d Cir. 1999) (quoting *Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor v. Gardner*, 882 F.2d 67, 70 (3d Cir. 1989)). Accordingly, "we need not accept the agency interpretation if it is 'plainly erroneous or inconsistent with the regulation.'" *Barnes*, 749 F.2d at 1018 (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)); *see also Conn. Gen. Life Ins. Co.*, 177 F.3d at 144 ("We 'must defer to the [agency's]

day during which 18 U.S.C. § 1464 will be enforced, the FCC should establish a violation of 18 U.S.C. § 1464 in order to show a violation of Rule 73.3999. And because the indecency provision of 18 U.S.C. § 1464 should be interpreted as containing a scienter element, so too should the indecency provision of 47 C.F.R. § 73.3999.

Moreover, the FCC cannot do by administrative rule that which Congress is constitutionally prohibited from doing by statute. Whether or not the indecency provision of 47 C.F.R. § 73.3999 functions independently of 18 U.S.C. § 1464, the FCC's rule risks chilling constitutionally protected speech in the same manner as the statutory provision. As a constitutional rule, *Smith* is no less relevant merely because the government acts through an executive agency in restricting the content of speech. Any government regulation penalizing the content of speech or expression should require proof of scienter as an element of liability to survive First Amendment scrutiny.

Scienter is an element in determining whether a violation of 18 U.S.C. § 1464 or 47 C.F.R. § 73.3999 occurred. A broadcast licensee should not be found liable for violating the

interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation."'" (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988))) (additional citation omitted) (alterations in original).

indecency provisions of 18 U.S.C. § 1464 or 47 C.F.R. § 73.3999 without proof the licensee acted with scienter. Because the Commission's proffered "non-delegable duty" theory of CBS's vicarious liability, which functionally equates to strict liability for speech or expression of independent contractors, appears to dispense with this constitutional requirement, it should not be sustained.

## C.

As an alternative to vicarious liability, the FCC found CBS directly liable for a forfeiture penalty under 47 U.S.C. § 503(b)(1)(B) for failing to take adequate precautionary measures to prevent potential indecency during the Halftime Show. *Reconsideration Order* at ¶ 17. According to the Commission, CBS deliberately ignored warnings that visual indecency might occur during the Halftime Show. The FCC contends the risk of indecency was obvious following public comments of Jackson's choreographer, who predicted that Jackson's performance would include "some shocking moments," and concerns raised by the NFL over the Halftime Show script. The FCC asserts that CBS failed to investigate these warnings or properly act to address the risk.

This failure, the FCC contends, satisfies the willfulness element of 47 U.S.C. § 503(b)(1)(B). Under 47 U.S.C. § 503(b)(1)(B), the FCC has authority to order forfeiture penalties upon determining that a person:

84

willfully or repeatedly failed to comply with any
of the provisions of this chapter or of any rule,
regulation, or order issued by the Commission
under this chapter or under any treaty, convention,
or other agreement to which the United States is
a party and which is binding upon the United
States.

*Id*. "Willful" is defined elsewhere in the Communications Act
as the "conscious and deliberate commission or omission of [an]
act, irrespective of any intent to violate any provision of this
chapter or any rule or regulation of the Commission authorized
by this chapter or by a treaty ratified by the United States." 47
U.S.C. § 312(f)(1). Applying this standard, the FCC asserts its
"finding of willfulness is based on CBS's knowledge of the
risks and its conscious and deliberate omissions of the acts
necessary to address them." *Reconsideration Order* at ¶ 23.

### 1.

As an initial matter, we note the record before us is
unclear on whether the agency properly applied the forfeiture
statute. As described, the Commission issued its forfeiture order
under 47 U.S.C. § 503(b)(1)(B), which includes an express
willfulness standard. But section 503(b)(1)(B) may not be the
applicable statutory provision for forfeitures based on broadcast
indecency. A separate provision of the forfeiture statute – 47
U.S.C. § 503(b)(1)(D) – authorizes the Commission to issue a
forfeiture penalty against any person the Commission

determines "violated any provision of section . . . 1464 of Title 18." Accordingly, the forfeiture statute on its face appears to require the Commission to sanction broadcast indecency through section 503(b)(1)(D) rather than through section 503(b)(1)(B).[32] *Cf. Action for Children's Television v. FCC*, 59 F.3d 1249 (D.C. Cir. 1995) (citing 47 U.S.C. § 503(b)(1)(D) as the relevant provision authorizing the FCC to impose a civil forfeiture for a violation of the indecency provision of 18 U.S.C. § 1464).

CBS and supporting amici contend the very fact of section 503(b)(1)(D) excludes the possibility of the FCC sanctioning violations of 18 U.S.C. § 1464 through section 503(b)(1)(B), because doing so would render section 503(b)(1)(D) superfluous. While this contention is perhaps meritorious, we recognize the Commission's interpretation of the Communications Act, including the relevant forfeiture provisions of 47 U.S.C. § 503(b)(1), would be entitled to considerable deference. But we cannot resolve this dispute

---

[32]If violations of 18 U.S.C. § 1464 may not be penalized under section 503(b)(1)(B), it is uncertain whether violations of 47 C.F.R. § 73.3999 may be penalized under that section. As discussed *supra*, 47 C.F.R. § 73.3999 does no more than establish the time of day during which 18 U.S.C. § 1464 will be enforced. If Congress intended for violations of 18 U.S.C. § 1464 to be penalized under section 503(b)(1)(D), then it may have intended for "violations" of 47 C.F.R. § 73.3999 also to be penalized under that section.

86

among the parties, because, as we will explain, the Commission's interpretation of the statutory scheme is unclear.

The FCC's initial *Forfeiture Order* and subsequent *Reconsideration Order* create some confusion. In both, the Commission frequently refers to 47 U.S.C. § 503(b) generally without specifying whether it is acting under subpart (1)(B) or subpart (1)(D). *See*, *e.g.*, *Forfeiture Order* at ¶ 1 n.1 (citing section 503(b) without specification of relevant subpart); *id*. at ¶ 15 (referring to CBS's forfeiture under "section 503(b)(1) of the Act"); *Reconsideration Order* at ¶ 5 ("The Forfeiture Order also rejected CBS's claim that the violation was accidental rather than willful under section 503(b)(1) of the Act."). Moreover, the Commission repeatedly describes its orders as determinations that CBS violated the indecency provisions of both 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999. *E.g.*, *Forfeiture Order* at ¶¶ 1, 7, 36; *Reconsideration Order* at ¶ 1 & n.3. Yet the Commission appears to be penalizing these violations only under section 503(b)(1)(B), and not under section 503(b)(1)(D):

> Under section 503(b)(1)(B) of the [Communications] Act, any person who is determined by the Commission to have willfully failed to comply with any provision of the Act or any rule, regulation, or order issued by the Commission shall be liable to the United States for a monetary forfeiture penalty. . . . For the reasons set forth above, we conclude under this

87

standard that CBS is liable for a forfeiture for its willful violation of 18 U.S.C. § 1464 and section 73.3999 of the Commission's rules.

*Forfeiture Order* at ¶ 36 (footnote omitted); *see also id*. at ¶ 30 n.103 ("As we find CBS legally responsible for the indecent broadcast based on both its own willful omission and its vicarious liability for the willful acts of its agents under the principle of respondeat superior, we need not address whether it could also be held responsible under Section 503(b)(1)(D) without a showing of willfulness.").

On this record, the FCC's orders may be read as penalizing a violation of 18 U.S.C. § 1464 under section 503(b)(1)(B). Or, the FCC's orders may be understood as penalizing CBS's violation of the indecency provision of 47 C.F.R. § 73.3999 under section 503(b)(1)(B) but not penalizing CBS's violation of the indecency provision of 18 U.S.C. § 1464. Under the latter reading, the FCC's assertions that CBS violated 18 U.S.C. § 1464 would be included in the orders only for the purpose of establishing CBS's violation of Rule 73.3999, which enforces 18 U.S.C. § 1464.

Again, it is unclear whether the statutory scheme permits violations of 18 U.S.C. § 1464 to be penalized by forfeitures issued under section 503(b)(1)(B) instead of, or in addition to, section 503(b)(1)(D). And, if section 503(b)(1)(D) is implicated here, it is unclear whether the willfulness standard applies under

that section. Unlike section 503(b)(1)(B), the language of section 503(b)(1)(D) does not include the term "willful."

Accordingly, further clarification from the FCC is necessary before it may be determined whether the agency correctly concluded that CBS's actions constituted a "willful" violation of the indecency provisions.

## 2.

The record is also unclear whether the Commission correctly determined that CBS's conduct satisfied the willfulness standard. Specifically, it is unclear whether the Commission's determination accounts for the apparent interplay between the statutory "willfulness" standard of the forfeiture statute and the constitutionally required scienter element of the indecency provisions. If the FCC based its forfeiture order in whole or in part on 47 U.S.C. § 503(b)(1)(D), and if it interpreted that section as not incorporating the willfulness standard of section 503(b)(1)(B), then the scienter element of 18 U.S.C. § 1464 would appear to set the bar for establishing that CBS acted with the requisite mental state.[33] But even if the

---

[33] The FCC has not yet addressed this possibility. *See Forfeiture Order* at ¶ 29 n.103 ("As we find CBS legally responsible for the indecent broadcast based on both its own willful omission and its vicarious liability for the willful acts of its agents under the principle of respondeat superior, we need not address whether it could also be held responsible under

willfulness standard is incorporated into section 503(b)(1)(D) – or if a forfeiture for broadcast indecency may issue entirely under section 503(b)(1)(B) – a showing of scienter is constitutionally required to penalize broadcast indecency. Accordingly, the willfulness standard, both as interpreted and as applied by the FCC, should set a bar at least as high as scienter. And on this record, it is not clear whether the FCC has complied with this requirement.

Forfeiture liability under 47 U.S.C. § 503(b)(1)(B) is triggered by a broadcast licensee's violation of a distinct "rule, regulation, or order of the Commission." This appears to call for a two-part inquiry: did a violation occur; and was that violation "willful" or "repeated" for the purposes of section 503(b)(1)(B).[34] Here, the triggering violations – that is, the violations that satisfy the first part – are CBS's alleged violations of the indecency provisions of 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999. Accordingly, it seems the Commission's first step should be to determine whether CBS's conduct violated the indecency provisions, including establishing scienter.

---

Section 503(b)(1)(D) without a showing of willfulness.").

[34]If 47 U.S.C. § 503(b)(1)(D) is interpreted as incorporating the willfulness standard, its operation appears identical. Forfeiture liability under that section is triggered by a broadcast licensee's violation of 18 U.S.C. § 1464.

90

The scienter element of the indecency provisions – as a constitutional requirement – is paramount. That is, scienter is the constitutional minimum showing for penalizing the speech or expression of broadcasters – irrespective of whether the penalty is in the form of a monetary forfeiture under 47 U.S.C. § 503(b)(1) or a different punitive measure available to the FCC. But the record is unclear whether the Commission's interpretation and application of the willfulness standard account for this apparent interplay with the scienter element of the indecency provisions. Accordingly, we are unable to decide whether the Commission's determination that CBS acted "willfully" was proper in light of this scienter requirement.

Determining whether CBS acted with the requisite scienter would call for an examination of the scienter element inherent in the indecency provisions. Where a scienter element is read into statutory text, scienter would not necessarily equate to a requirement of actual knowledge or specific intent. *See Carter v. United States*, 530 U.S. 255, 269 (2000) (citing *Staples v. United States*, 511 U.S. 600 (1994)). "The presumption in favor of scienter requires a court to read into a statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct." *Id*. (citing *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)). In some circumstances, recklessness is considered a sufficiently culpable mental state for the purposes of imposing liability for an act. *E.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976) ("In certain areas of the law recklessness is considered to be a form

of intentional conduct for purposes of imposing liability for some act.").

Recklessness would appear to suffice as the appropriate scienter threshold for the broadcast indecency regime. It is likely that a recklessness standard would effectively "separate wrongful conduct from otherwise innocent conduct" of broadcasters, *Carter*, 530 U.S. at 269, without creating an end-around indecency restrictions that might be encouraged by an actual knowledge or intent standard. And a broadcast licensee's reckless disregard for the content of its programming would be likely to unreasonably create a known or obvious risk of indecent material being aired, making it highly probable that harm will follow. *See Safeco Ins. Co. of Am. v. Burr*, - - U.S. --, 127 S.Ct. 2201, 2215 (2007) ("While 'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994); citing Prosser and Keeton, Handbook of the Law of Torts § 34 at 213-14)).

Also instructive here are other cases determining recklessness to be an adequate level of scienter for imposing liability in related First Amendment contexts where speech or expression is restricted based on its content. In *Osborne v. Ohio*, 495 U.S. 103 (1990), the Supreme Court addressed a criminal defendant's constitutional challenges to Ohio's

92

prohibition against possessing and viewing child pornography. The petitioner in *Osborne* contended in part that the statute was unconstitutional because it did not expressly include a scienter element. *See id.* at 112 n.9. But the Court rejected this argument, noting that "Ohio law provides that recklessness is the appropriate *mens rea* where a statute 'neither specifies culpability nor plainly indicates a purpose to impose strict liability.'" *Id.* (quoting Ohio Rev. Code Ann. § 2901.21(B) (1987)). The Court went on to explain:

> The Ohio Supreme Court also concluded that the State had to establish scienter in order to prove a violation of [the child pornography statute] based on the Ohio default statute specifying that recklessness applies when another statutory provision lacks an intent requirement. The [child pornography] statute on its face lacks a *mens rea* requirement, but that omission brings into play and is cured by another law that plainly satisfies the requirement laid down in *Ferber* that prohibitions on child pornography include some element of scienter.

*Id.* at 115 (citations omitted).

But recklessness should be the constitutional minimum. A broadcast licensee's mere negligence in airing indecent material during a restricted time slot would not satisfy the scienter element of 18 U.S.C. § 1464 or 47 U.S.C. § 73.3999.

93

In *Manual Enterprises*, the Supreme Court read a scienter element into a federal statute prohibiting the advertisement of obscene material through the mails. 370 U.S. at 492-93. The Court addressed the scope of this inferred scienter element, stating "it may safely be said that a federal statute which, as we construe it, required the presence of that [scienter] element is not satisfied . . . merely by showing that a [magazine publisher] defendant did not make a good faith effort to ascertain the character of his advertiser's materials." *Id*. at 493. In the broadcast indecency context, a broadcaster might act recklessly if it fails to exercise proper control over the unscripted content of its programming. But when a broadcaster endeavors to exercise proper control, but ultimately fails, to prevent unscripted indecency, it will not have acted with scienter if its actions were negligent rather than reckless.

The airing of scripted indecency or indecent material in pre-recorded programming would likely show recklessness, or may even constitute evidence of actual knowledge or intent. But when unscripted indecent material occurs during a live or spontaneous broadcast, as it did here, the FCC should show that the broadcaster was, at minimum, reckless in causing the indecent material to be transmitted over public airwaves.[35] A

---

[35]The facts of *Young Broadcasting*, as alleged by the FCC in its Notice of Apparent Liability in that case, may be indicative of recklessness. There, the broadcast licensee presented inherently risky programming, a segment titled "Puppetry of the

94

broadcaster's failure to use available preventative technology, such as a delay mechanism, when airing live programming may, depending on the circumstances, constitute recklessness.

Here, CBS contends it took adequate measures to guard against the risk of unscripted indecency in the Halftime Show. It points to numerous script reviews and revisions on record, several wardrobe checks, and the implementation of a standard-industry-practice audio delay. CBS also notes that it engaged in extensive internal discussions and dialogue with the NFL over concerns relating to potential performers and content of the Halftime Show. CBS rejected other potentially-controversial performers who had previously engaged in offensive on-air conduct in favor of Jackson and Timberlake, with the NFL ultimately approving the selections. Timberlake in particular, CBS asserts, had on several prior occasions performed "Rock Your Body" live on national television without incident. CBS also rejects the FCC's contention that Jackson's choreographer's

---

Penis," and invited performers on camera who it knew were nude below their overcoats and who it knew employed nudity as a central part of their act. Indeed, the performers were a source of interest for the program precisely because their act involved nudity and the graphic display of sexual organs. Moreover, the broadcast licensee's off-camera employees urged the performers to demonstrate their act – which involved manipulating their genitalia to form various objects – while the cameras were broadcasting live.

"shocking moments" prediction should have elicited concern about the potential for unscripted nudity, explaining that the statement was reasonably considered commonplace entertainment industry hyperbole and a veiled reference to Timberlake's surprise guest appearance. Moreover, CBS notes "it is undisputed that, after the [choreographer's "shocking moments"] quote appeared, CBS reviewed the script, issued wardrobe instructions, checked Jackson's costume, and implemented a delay to ensure adherence to CBS standards." CBS Reply Br. at 23 (emphasis omitted).

The Commission disputes the adequacy of these efforts by CBS. And the parties also dispute the availability – or lack thereof – of video delay technology at the time of the Halftime Show.[36] The FCC contends CBS should have instituted a video delay mechanism to guard against a potential act of indecency. *See, e.g., Reconsideration Order* at ¶ 22 n.71 ("Notwithstanding CBS's protestations to the contrary, delaying a live broadcast long enough to block visual indecency does not appear to pose major technical challenges to a company such as CBS."). But according to CBS, "no such technology had ever been developed, or was thought necessary, before the unprecedented halftime incident." CBS Reply Br. at 23. Instead, CBS states its implementation of a five-second audio delay was both "state of the art" and standard industry practice at the time of the

---

[36] This issue appears central to a recklessness inquiry on the facts here.

Halftime Show. *See, e.g., Reconsideration Order* at ¶ 22 ("[CBS] asserts that [its use of audio but not video delay] did not reflect a 'calculated risk' but rather simply conformance with standard industry practice, and that a video delay was 'entirely unprecedented, and the technique had to be specifically engineered after the Super Bowl incident.'").

The Commission has not refuted CBS's assertions. Instead, it points only to CBS's use of video delay for an awards show in the weeks following the Halftime Show. But the state of the art even shortly after the Halftime Show does not necessarily refute CBS's contention that video delay technology was newly created for the awards show as a reaction to the Halftime Show incident but otherwise unavailable prior to that time. The record at present is scant on evidence regarding the availability, history and other details of video delay technology. And the Commission cannot prevail if the issue of CBS's scienter is to be resolved only on assertions of the parties that are unsupported by evidence on record. Because the Commission carries the burden of showing scienter, it should have presented evidence to demonstrate, at a minimum, that CBS acted recklessly and not merely negligently when it failed to implement a video delay mechanism for the Halftime Show broadcast.

Accordingly, we are unable to decide whether the Commission's determination that CBS acted "willfully" was proper in light of the scienter requirement.[37]

## V.

In finding CBS liable for a forfeiture penalty, the FCC arbitrarily and capriciously departed from its prior policy excepting fleeting broadcast material from the scope of actionable indecency. Moreover, the FCC cannot impose liability on CBS for the acts of Janet Jackson and Justin Timberlake, independent contractors hired for the limited purposes of the Halftime Show, under a proper application of vicarious liability and in light of the First Amendment requirement that the content of speech or expression not be

---

[37]As discussed, it is unclear whether the Commission interprets the willfulness standard, which requires a "conscious and deliberate" act or omission, as setting a lower or higher bar than scienter. We note there appears to be tension between the common understanding of the terms "conscious and deliberate" – which typically indicate a higher standard than recklessness – and the Commission's interpretation of those terms in its application of the willfulness standard of 47 § U.S.C. 503(b)(1)(B) to CBS. But because further clarification is needed on the FCC's interpretation of the text and mechanics of the forfeiture statute, we do not decide whether the Commission's interpretation of these terms, or its application of the willfulness standard, is permissible.

penalized absent a showing of scienter. And the FCC's interpretation and application of 47 U.S.C. § 503(b)(1) are not sufficiently clear to permit review of the agency's determination of CBS's direct liability for a forfeiture penalty based on broadcast indecency.

Further action by the Commission would be declaratory in nature, as the agency may not retroactively penalize CBS. Even so, our holding will not foreclose all of the Commission's adjudicatory options. In *Golden Globes*, for instance, the Commission set forth a new policy and proceeded with its indecency determination even though a retroactive monetary forfeiture was unavailable. *See id*. at ¶ 15 (concluding that "[b]ut for the fact that existing precedent would have permitted this broadcast, it would be appropriate to initiate a forfeiture proceeding . . ."); *see also* 33 Wright & Koch, Federal Practice and Procedure: Judicial Review § 8313(c) (2007) (suggesting that, in order to "avoid arrogating authority" for policymaking that is assigned to the agency, remand is appropriate when an agency has issued an arbitrary decision). Accordingly, we will vacate the orders of the FCC and remand for further proceedings consistent with this opinion.

RENDELL, Circuit Judge, concurring in part, dissenting in part.

I wholeheartedly agree with the majority's cogent reasoning and conclusion that the FCC's imposition of a fine against CBS cannot stand, because it acted arbitrarily and capriciously in doing so.

However, I disagree with our opining, in dicta, regarding the various possible levels of scienter arguably required under § 503(b)(1)(B) or (D), or 18 U.S.C. § 1464, or the Constitution. For one thing, this is dicta. For another, the FCC has conceded that the level of scienter required in order to warrant a fine is "willful," and has itself urged that the definition of "willful" is as set forth in 47 U.S.C. § 312(f)(i), meaning "conscious and deliberate commission or omission of such act." Appellee's Br. 34-38.

Were it necessary to venture more deeply into the issue of scienter, which I submit it is not, we should point out that the real dispute between the parties is as to what must have been "willful." The FCC adopted the position that the conscious and deliberate act was simply the act of broadcasting,[38] while the

---

[38]The majority points out that the FCC only "abandoned" this position – or, really, side-stepped it – in the *Reconsideration*

opposing (and, I believe, better) view is that the requisite conscious and deliberate act is the act of broadcasting the indecent material at issue.[39]  Clearly, CBS's conduct here fails the latter test.

I also take issue with the majority's conclusion that there is a need to remand this case.  We have held that the instant fine was improperly imposed. There are no further proceedings necessary.[40]  Should the FCC wish to explain its change in policy, it can do so in the next case or issue a declaratory ruling. *See* 47 C.F.R. § 1.2.[41]  It serves no purpose to do so in the

---

*Order*, where it sought to impose the prevention of this type of broadcast as a non-delegable  duty.  *See Reconsideration Order* at ¶ 23.

[39]Or, if an omission, as the FCC alternatively argues, the conscious and deliberate failure to prevent the broadcast of indecent material.

[40]Because we have held that the FCC changed its policy, and because the broadcast at issue predated this change, the FCC cannot, consistent with its policy, re-impose the fine after providing an explanation. *See Golden Globes*, 18 F.C.C. 19859, at ¶ 15 & n.40.

[41]The majority cites *Golden Globes* as authority for the agency's setting forth a new policy on remand, but that case did not involve a remand. Moreover, the passage from the treatise

101

context of this litigation. Nothing is to be gained, and CBS should not be forced to be a party to any such remand, with its attendant time and expense. Accordingly, I respectfully disagree with the disposition of this appeal and would reverse the order imposing forfeiture, without remanding the case.

---

cited by the majority, 33 Wright & Koch, Federal Practice and Procedure: *Judicial Review* § 8313(c) (2007), concerns the proper disposition of a case where further proceedings are necessary for the agency to consider the matter anew and reach a well-reasoned ultimate decision. That is not the case here where the arbitrariness of the agency's decision is conclusive as to the outcome of the case.